# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:02 CV-33-MU

DARRELL EUGENE STRICKLAND    )
                                  )
       **Petitioner,**          )
                                  )
**vs.**                            )          **ORDER**
                                  )
**R.C. LEE, Warden,**           )
**Central Prison**                )
**Raleigh, North Carolina**     )
                                  )
       **Respondent.**         )
_____)

       This matter is before the Court upon Petitioner Darrell Eugene Strickland's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. §2254. Petitioner filed the instant Petition on January 25, 2002. Also before the Court are Respondent's Motion for Summary Judgment, and Petitioner's Motion to hold this matter in abeyance pending the United States Supreme Court's decision in *Rompilla v. Horn,* No. 04-5462, *decided sub. nom. Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456 (2005).

## FACTS

       On January 23, 1995, Darrell Eugene Strickland (hereinafter "Petitioner" or "Strickland") was indicted for the first-degree murder of Henry Brown (hereinafter "victim" or "Henry"). The State entered notice of intent to seek the death penalty. Strickland was tried to a jury at the October 16, 1995, Criminal Session of Superior Court, Union County, the Honorable Sanford L. Steelman, Jr., Judge Presiding. Strickland was represented by Harry B. Crow, Jr. and Stephen Goodwin, Jr.

The facts of this case are summarized in the North Carolina Supreme Court's opinion on

Strickland's direct appeal:

> The State's evidence tended to show *inter alia* that on 1 January 1995, the victim, Henry Brown, went with his wife, Gail Brown, and her six-year-old child to the home of defendant, who lived with Sherri Jenkins and their two-year-old son in Marshville, North Carolina. Mrs. Brown had formerly worked with both Ms. Jenkins and defendant at Cuddy Foods in Marshville and had been "good friends" with Ms. Jenkins for about six years. Ms. Jenkins had been dating defendant for thirteen years, had mothered his two-year-old son, and had been cohabiting with defendant for about six months at the time of the murder.
>
> The Browns arrived at the residence of defendant and Ms. Jenkins at approximately 8:00 p.m. Mr. Brown had been drinking but was not drunk. Mr. Brown and defendant went into the kitchen, while Mrs. Brown and Ms. Jenkins stayed in the living room. The children were sent into the bedroom to play, and the adults began drinking alcoholic beverages. Ms. Jenkins testified at trial that they shared a marijuana joint and that all four adults drank from a half-gallon bottle of gin. The four adults continued drinking and talking for several hours. During this time, a shotgun owned by defendant was passed around. Everyone was talking about shooting it and joking about shooting each other, but there were no serious threats. There were two shells in the gun and no other shells in the house. Ms. Jenkins took the gun outside and fired it once.
>
> At approximately 1:30 a.m., Mrs. Brown and Ms. Jenkins were in the kitchen preparing food for everyone to eat. The men were in the living room. Mrs. Brown testified that, while in the kitchen, she looked into the living room, where she saw her husband sitting on an ottoman with his head in his hands. Defendant was standing to the back and side of Mr. Brown with the gun in his hand pointed at Mr. Brown. Mrs. Brown saw defendant's lips move but could not hear what he said. She then heard the gun being fired, smelled burning flesh, and saw her husband fall over.
>
> Ms. Jenkins testified that she witnessed the victim sitting on the ottoman with defendant standing behind him. The victim was mumbling something that she could not hear. She stepped outside to feed the cats, during which time she heard the gun go off. She came back inside and saw the victim fall over. According to Ms. Jenkins, the victim's behavior that evening was obnoxious and loud. He was cursing at intervals and drinking alcohol throughout the night.
>
> Immediately following the shooting, defendant left in his truck. He drove to the house of his ex-wife, Ms. Betty Sanders, in Marshville. Defendant asked Ms. Sanders to drive him in his truck to his uncle's house in Rockingham. At approximately 2:45 a.m., Ms. Sanders and defendant were stopped in Rockingham by Officer Poston and Officer Grant of the Rockingham Police Department, which had been notified to be on the lookout for defendant. Officer Grant transported

defendant to the Rockingham Police Department.

  At the Police Department, after being advised of his constitutional rights, defendant spoke to Special Agent Tony Underwood of the State Bureau of Investigation (SBI) and Detective Bill Tucker of the Union County Sheriff's Department. Defendant told them that he shot Henry Brown because "he pissed me off" and because "he called me a punk Indian son-of-a-bitch." Defendant said that no one else had anything to do with the shooting. He said that he "meant to kill" the victim. He denied that alcohol had caused him to commit the murder. Defendant said that he had not planned to kill the victim. He did however say that he had to cock the gun in order to get it to shoot.

  Detective Easley of the Union County Sheriff's Department examined the crime scene during the early morning hours of 2 January 1995. Detective Easley found the body of Henry Brown lying on the living room floor on its left side. Blood was coming from the victim's nose and mouth and a hole in the back shoulder area. There was no weapon on or around the victim's body. In the gun cabinet, Detective Easley found one Ithaca twelve-gauge pump shotgun which contained one spent Winchester "double aught" buckshot casing in the chamber. He also found one spent "double aught" buckshot shell outside on the ground about eleven inches from the front doorstep.

  Michael Gavin of the forensic firearms and tool marks unit of the SBI laboratory tested the shotgun and found that the gun functioned properly. Gerald Long, owner of Long's Sporting Goods and Pawn Shop, testified that he had experience in selling, firing, and repairing Ithaca twelve-gauge pump shotguns. He testified that, in his opinion, the Ithaca shotgun, in the hands of someone not experienced with it, would go off faster than any other shotgun on the market and is susceptible to accident.

*State v. Strickland*, 488 S.E.2d 194, 198 -199 (NC 1997).

  The jury returned a verdict of guilty of first-degree murder on the basis of premeditation and deliberation. At a separate capital sentencing proceeding, the jury found the aggravating circumstance that the defendant had previously been convicted of a felony involving the use or threat of violence to the person. *See* N.C. Gen. Stat. § 15A-2000(e)(3)(Supp. 1994) (amended 1995). The jury did not find the existence of any mitigating circumstances. The jury recommended a sentence of death, and the trial court sentenced defendant accordingly.

# PROCEDURAL HISTORY

Strickland filed a direct appeal to the North Carolina Supreme Court, which was denied. *State v. Strickland*, 488 S.E.2d 194 (NC 1997). On January 20, 1998, the United States Supreme Court denied Strickland's Petition for Writ of Certiorari. *Strickland v. North Carolina*, 522 U.S. 1078, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998).

After the appointment of post-conviction counsel, Strickland filed a Motion for Appropriate Relief (hereinafter "MAR") in the Superior Court of Union County on December 7, 1998. On March 23, 1999, he filed an amendment to the MAR. On September 20, 1999, he filed a restated amendment to the MAR, and on December, 2, 1999, he filed a second amendment to the MAR. The State filed its Responses on November 21, 2000.

On May 21, 2001, an evidentiary hearing on Petitioner's MAR was held in the Superior Court of Union County, William H. Helms, Judge Presiding. Petitioner was represented by post-conviction counsel, Lara Nichols and James N. Freeman, Jr. On June, 31, 2001, Judge Helms entered an Order denying Strickland's MAR. On December 18, 2001, the North Carolina Supreme Court denied Strickland's Petition for Writ of Certiorari. *State v. Strickland*, 559 S.E.2d 551 (NC 2001).

On January 25, 2002, Strickland filed the instant Petition for Writ of Habeas Corpus (hereinafter "PWHC"). On April 17, 2002, Strickland filed a motion to voluntarily dismiss Claim No. XVI of the Petition, which this Court granted on April 26, 2002.

On July 12, 2002, Respondent filed an Answer and Motion for Summary Judgment. On July 25, 2002, Strickland filed a motion to strike Respondent's Answer and for an order directing Respondent to file a new Answer specifically admitting or denying the allegations of each of the

numbered paragraphs in the habeas petition and setting out affirmative defenses it intended to raise for each claim. On August 15, 2002, this Court entered an Order requiring Respondent to file a new Answer. On September 20, 2002, Respondent filed a new Answer and renewed the Motion for Summary Judgment.

On December 13, 2002, this Court entered an Order on its own motion putting Petitioner and Respondent on notice that it intended to raise the issue of procedural default *sua sponte*. By way of the same written Order, the Court instructed both parties to brief the issue of procedural default with regard to certain of Petitioner's claims identified in the Order. On January 9, 2003, Petitioner filed a brief addressing the issue of procedural default. Respondent filed a brief on January 13, 2003. On October 15, 2003, Petitioner filed a supplement to his brief on procedural default.

Upon Petitioner's motion, this matter was held in abeyance pending the outcome of *State v. Hunt*, (5A-86-8), which the North Carolina Supreme Court decided on July 16, 2003. 582 S.E.2d 593 (2003). On November 5, 2003, Petitioner filed a Brief in Response to the Respondent's Motion for Summary Judgment.

On October 24, 2004, Petitioner filed a motion to hold this matter in abeyance pending the United State Supreme Court's decision in *Rompilla v. Horn*, No. 04-5462, *decided sub. nom. Rompilla v. Beard*, ___ U.S. ___, 125 S.Ct. 2456 (2005). On January 27, 2005, Respondent filed a motion seeking to file additional authority in support of its Motion for Summary Judgment.

On June 14, 2005, this Court entered its second Order directing the parties to address the issue of procedural default with regard to additional claims raised in the instant Petition. Both parties filed their briefs on July 25, 2005. These matters are now ripe for review.

**LEGAL STANDARDS**

**A. Standard of Review under The Antiterrorism and Effective Death Penalty Act of 1996**

For those of Strickland's claims adjudicated on the merits by a North Carolina court, this court's review is limited by the deferential standard of review set forth in The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), 28 U.S.C. § 2254, as interpreted by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). This court may not grant federal habeas relief unless the North Carolina court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

In *Williams*, the Supreme Court described two ways in which a state court decision will be "contrary to" clearly established Federal precedent within the meaning of § 2254(d)(1). *Williams*, 529 U.S. at 405-06. A state court decision will fall under the "contrary to" clause if the state court "applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Id.* In either of those scenarios, a Federal habeas court would be unconstrained by § 2254(d)(1) because the state court decision would fall within the § 2254 (d)(1) "contrary to" clause. *Id.* at 406.

A state court decision involves an unreasonable application of clearly established law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. The Supreme Court also made it clear that an unreasonable application of federal law differs from an incorrect application of federal law.

*Id.* at 410. Thus, "under 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id* at 411. In deciding whether a state court's application of clearly established federal law is unreasonable within the meaning of § 2254(d), a federal habeas court should ask whether the state court's application of clearly established federal law was "objectively unreasonable."[1] *Williams,* 529 U.S. at 409.

## B. Summary Denial by State Courts

The North Carolina Supreme Court summarily denied most, if not all, of the claims Strickland raised as preservation issues on direct appeal. A summary denial constitutes an adjudication on the merits, and the deferential standard of review outlined in § 2254(d)(1) still applies. *See Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) (citing *Wright v. Angelone*, 151 F.3d 151, 156-57 (4th Cir. 1998)). Therefore, in those cases where the State court summarily denied a claim, the Court will conduct an independent examination of the record and the clearly established Supreme Court law while still applying the deferential standard required by § 2254(d)(1). *See id.* (citing *Bacon v. Lee*, 225 F.3d 470, 478 (4th Cir.2000)).

## C. Harmless Error Analysis

If the Court finds that trial error rising to the level of a constitutional violation occurred, the error must then be evaluated under the standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Under the *Brecht* standard, a

---

[1]Respondent quoted the *Green v. French* test for determining whether a state court's application of established federal law was "unreasonable." 143 F.3d 865, 873 (4th Cir. 1998). That standard was rejected by the U.S. Supreme Court in *Williams v. Taylor*. 529 U.S. at 409-10.

reviewing court must determine whether the constitutional error had a "substantial or injurious effect or influence in determining the jury's verdict." *Id*. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). The *Brecht* standard is rooted in the federal harmless-error statute, 28 U.S.C. § 2111. *Brecht*, 507 U.S. at 638. Under the *Brecht* standard, "habeas petitioners obtain plenary review of constitutional claims, but cannot receive habeas relief based on trial error unless they establish that the error resulted in "actual prejudice." *Id*. (citing *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)).

## PROCEDURALLY DEFAULTED CLAIMS

Ordinarily a federal habeas court will not review a claim that is procedurally defaulted, absent a showing of cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 731-32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (holding that a claim dismissed on a state procedural rule is procedurally barred on federal habeas review). Generally, a claim will be defaulted if a state court has expressly found that review is barred by an adequate and independent state procedural rule, *see Ashe v. Styles*, 39 F.3d 80, 85 (4th Cir. 1994), or if the claim was not presented to all appropriate state courts and an adequate and independent state procedural rule would now bar review, *see Clagett v. Angelone*, 209 F.3d 370, 378 (4th Cir. 2000), *cert. denied* 530 U.S. 1285 (2000).

Procedural default is an affirmative defense that must be raised by the state if it is not to lose the right to assert the defense thereafter. *Gray v. Netherland*, 518 U.S. 152, 165-66, 116 S.Ct. 2074, 2082 (1996). In this case, Respondent has not asserted a procedural default defense to any of Strickland's claims. However, the Fourth Circuit has held that a federal habeas court

has the discretion to raise the issue of procedural default *sua sponte* despite a state's failure to preserve or present the issue properly. *Yeatts v. Angelone*, 166 F.3d 255, 261 (1999).

Both parties were notified in a December 13, 2002 Order that the Court might raise the issue of procedural default *sua sponte*. *See id.* at 262; *see also Roach v. Angelone*, 176 F.3d 210, 215 n.3 (4th Cir. 1999) (declining to raise procedural default *sua sponte* in part because the petitioner had not been provided an opportunity to address the issue). In that Order, the Court identified a number of Petitioner's claims that it thought might raise procedural default issues and ordered each side to brief the issue with regard to those claims. Both Petitioner and Respondent filed briefs addressing the issue of procedural default with regard to the claims identified by the Court.

On June 14, 2005, the Court entered a second Order directing the parties to brief the issue of procedural default with regard to additional claims raised in the instant Petition. Both parties filed briefs addressing these claims on July 25, 2005.

## A. "Adequate and Independent State Procedural Rule"

Generally, a claim will be defaulted if a state court has expressly found that review is barred by an adequate and independent state procedural rule. *See Ashe v. Styles*, 39 F.3d at 85. "A state rule is adequate if it is 'firmly established,' and regularly and consistently applied by the state court." *McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000) (internal citations omitted). A state procedural rule is independent if it does not "depend[] on a federal constitutional ruling." *See Burket v. Angelone*, 208 F.3d 172, 183 (4th Cir. 2000) (citing *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988)).

Petitioner argues that when a state court reaches the merits of a claim, the procedural

default doctrine does not apply. However, if a state court clearly relies on an adequate and independent state procedural bar and then also finds no federal violation, that suffices to establish procedural default. *See Harris v. Reed*, 489 U.S. 225, 264 n.10, 109 S.Ct. 1038, 144 n. 10, 103 L.Ed.2d 308 (1989)); *see also Skipper v. French*, 130 F.3d 603, 609 (4th Cir.1997) ("A decision which bases dismissal both on the merits and on an independent and adequate state law ground forecloses federal habeas review."); *Ashe v. Styles*, 39 F.3d at 86 (Where a state court "both addresses the merits of the federal question but also invokes a state procedural bar that is adequate and independent of federal law as an independent ground for decision, a federal court must accord respect to the state ground for decision . . . ."). Thus, although the State courts may have reached the merits of some of these claims, the procedural default doctrine still applies.

## B. Failure to Exhaust in State Courts

Absent a valid excuse, a state petitioner must exhaust his remedies in state court before seeking federal habeas corpus relief. *See* § 2254(b)(1)(A). Generally, a claim will be defaulted on federal habeas review if the claim was not fairly presented to all appropriate state courts and an adequate and independent state procedural rule would now bar review. *See Clagett v. Angelone*, 209 F.3d at 378.

In the instant Petition, Petitioner has raised a number of unexhausted claims that would be barred in the state courts if he attempted to raise them now. For its part, Respondent has stated in its September 20, 2002 Answer that "Respondent agrees that petitioner has exhausted the state remedies as required by 28 U.S.C. § 2245[sic](b)(1)(A)." Because Respondent failed to assert the affirmative defenses of exhaustion and procedural default for any of Petitioner's claims, Petitioner urges the Court to apply the civil doctrine of "waiver," which prohibits the

Court from considering any claim or defense that the parties failed to raise.

Under the circumstances of this case, the Court does not view the above-mentioned statement by Respondent as an intelligent waiver of the exhaustion requirement. *See* § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."). It is apparent from the various filings in this Court that Respondent paid only cursory attention to the claims and arguments raised in the Petition and to the Record in this case when preparing the Answer and Motion for Summary Judgment.[2] Therefore, the Court views Respondent's "agreement" that Petitioner has exhausted state remedies as merely an erroneous statement of the procedural history in this case. *See e.g., Day v. McDonough*, __ U.S. __, 126 S.Ct. 1675, 1684, 164 L.Ed.2d 376 (2006) (District court had authority to *sua sponte* dismiss habeas petition despite State's agreement that petition was timely where agreement was based upon miscalculation of time, not intelligent waiver). The Court finds it significant that when twice ordered to address the issue of procedural default, which includes exhaustion issues, Respondent did not assert that it was waiving the exhaustion requirement. In fact, in one of the briefs addressing procedural default, Respondent asserts that the failure to raise the issue of procedural default was inadvertent. (Respondent's January 13, 2003 Brief)

Additionally, there is a difference between ordinary civil cases and habeas petitions. Rule 4 of the Rules Governing Section 2254 cases states, "If it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the petitioner to be

---

[2]Examples are cited throughout this Order.

notified." This rule "differentiates habeas cases from other civil cases with respect to *sua sponte* consideration of affirmative defenses." *Kiser v. Johnson*, 163 F.3d 326, 328 (5th Cir.1999); *see also Hill v. Braxton*, 277 F.3d 701, 705 (4th Cir.2002). As the Fourth Circuit noted in *Hill*, "[a]ctions brought pursuant to § 2254 implicate considerations of comity, federalism, and judicial efficiency to a degree not present in ordinary civil actions." 277 F.3d at 705. "These interests eclipse the immediate concerns of the parties and provide federal habeas courts the discretionary authority to raise affirmative defenses that have not been preserved by the state." *Id.* (citing *Yeatts v. Angelone*, *supra*, 166 F.3d at 261).

Under the circumstances presented in this case, the Court believes it is appropriate to address the issue of procedural default notwithstanding Respondent's failure to assert that defense. First, the instances of procedural default are numerous. Second, to consider Petitioner's unexhausted claims would contravene the intent of Congress which mandated in the AEDPA that a petitioner exhaust state court remedies before seeking habeas review of constitutional claims. Finally, federal habeas review would amount to a windfall for Petitioner. He would win plenary review of claims that he did not present to the North Carolina courts, whereas habeas petitioners who properly presented their claims to state courts first would be entitled only to the extremely narrow review mandated by section 2254(d).

## DISCUSSION[3]

### CLAIM I A: *BRADY V. MARYLAND* CLAIMS

---

[3]References to the trial transcript appear as (Tp _); references to the MAR evidentiary hearing transcript appear as (MAR Tp _).

Prior to trial in this case, Gail Brown, the State's key eye-witness, had three conversations with law enforcement officers in the days following the shooting of her husband, Henry Brown. None of the officers' reports containing these conversations was turned over to petitioner's trial counsel. During post-conviction discovery, the State turned over to Strickland's post-conviction counsel: 1) the Incident/Investigation Report of Ted Keziah, the first officer to respond to the scene of the shooting (Pet. Exh. 82); 2) a statement made by Gail Brown to SBI Special Agent Tony Underwood on January 2, 1995 (Pet. Exh. 83); 3) a statement made by Gail Brown to Agent Underwood on February 7, 1995 (Pet. Exh. 84); and 4) a typed synopsis of the case made for the SBI by Agent Underwood on February 22, 1995 (Pet. Exh. 88). Strickland asserts that those documents should have been turned over to his trial counsel under *Brady v. Maryland*, 373 US 83, 83 S.Ct. 1194 (1963), because they contained exculpatory evidence, impeaching materials and prior inconsistent statements made by Gail Brown to investigators. Strickland claims that the prosecution's failure to comply with *Brady* deprived him of his right to confront witnesses, to a reliable guilt phase and sentencing phase proceeding and to due process, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

In *Brady v. Maryland*, the United States Supreme Court held that the prosecution deprives a criminal defendant of due process when it suppresses evidence that is "favorable to an accused . . . where that evidence is material either to guilt or punishment . . . ." 373 US at 87. There are three elements that Petitioner must establish in order to prove a *Brady* violation: (1) the evidence must be favorable to Petitioner, "either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) the evidence must be material, *i.e.*, "prejudice must have ensued."

*Strickler v. Greene*, 527 U.S. 263, 282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). In order

to establish the "prejudice" component, Petitioner must show that "there was a reasonable

probability" that the result of the trial would have been different if the suppressed evidence had

been disclosed to the defense. *Strickler*, 527 U.S. at 263. In other words, the question is whether

"the favorable evidence could reasonably be taken to put the whole case in such a different light

as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555,

1566, 131 L.Ed.2d 490 (1995).

### 1) *Officer Keziah's Incident/Investigation Report* (Pet.'s Exh. 82)

Officer Ted Keziah was the first law enforcement officer to talk to Gail Brown about

what happened on the night of the shooting. Among other notations, his brief

Incident/Investigation Report contains the following sentence: "Gale [sic] stated they were fixing

them something to eat and Henry and Eugene were running there [sic] mouths at one another and

Eugene Strickland got a shotgun out of the cabinet and shot Henry." Strickland argues that Gail

Brown's comment that the two men were "running their mouths at one another" was exculpatory

because it tended to negate the first-degree murder elements of premeditation and deliberation.

Strickland argues further that this comment could have been used to impeach Gail Brown's trial

testimony that the two men were not arguing or fighting prior to the shooting.

Strickland raised this claim in his Restated Amendment to his MAR. (Pet. Exh. C, p. 6, ¶

238 (a)) The MAR court held that the State's failure to disclose Gail Brown's comment to

Officer Keziah that Strickland and Henry Brown had been "running their mouths" at each other

was not a violation of *Brady* because Gail Brown had made no mention to Officer Keziah that

the two men were fighting or threatening each other. (MAR Order, Claim V, p. 17) Because the

MAR court correctly identified the governing legal standard as that set forth in *Brady v. Maryland*, 373 US at 87, this Court's review is limited to the question of whether that court's application of *Brady* was "objectively unreasonable." *See Williams*, 529 U.S. at 409, 120 S.Ct. 1495.

The MAR court's determination that "running their mouths at each other" meant something other than "fighting or threatening each other" is a finding of fact. A finding of fact by a State court is presumed to be correct, and Petitioner bears the burden of rebutting that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Despite *Strickland*'s presumption that "running their mouths at each other" means arguing or fighting, the expression is ambiguous. It could mean arguing or fighting. It also could mean a kind of "one-upsmanship." In fact, there was evidence from both Gail Brown and Sherry Jenkins Strickland[4] that the two men were engaging in "one-upsmanship" throughout the evening. Gail testified that Strickland, Henry and Sherry were joking around about the shotgun and telling each other they should get the gun and shoot each other. (Tpp 968-69) Sherry testified that on a few occasions during the evening, Strickland and Henry discussed "whipping each other's tails," and "who was the baddest." (Tp 1235) Detective Bill Tucker, who interviewed Sherry in the aftermath of the shooting, testified on rebuttal for the State that Sherry had told him that the two would then "hug and laugh," and that she never took what they were saying seriously. (Tp 1332) During the MAR evidentiary hearing, Sherry even equated "running their mouths at each other with "one-upsmanship":

---

[4]Petitioner and his girlfriend, Sherry Jenkins, were married sometime after the trial and before the MAR hearing. For the sake of consistency, the Court will refer to Sherry Jenkins Strickland as "Sherry" or "Sherry Strickland" throughout this Order.

> *Prosecutor*: And you told Mr. Crow that they were discussing whipping each
>> others tails, who was the baddest, back and forth?
> *Mrs. Strickland*: That's at the very beginning of the night when they first came in.
> *Prosecutor*: So they were just running their mouths at each other?
> *Mrs. Strickland*: In the very beginning, yes.

(MAR Tp 101)

Contrary to Petitioner's assertion that the shooting occurred "after hours of verbal arguing" (PWHC ¶ 284), no one who testified at trial used the words "arguing," "fighting" or "threatening" to describe Strickland and Henry Brown's behavior toward one another. Although Sherry testified that Henry was "[o]bnoxious at times, very loud" (Tp 1252) and that she was nervous "that he might start an argument that would end up being a serious conflict" (Tp 1236), she did not testify that she witnessed or heard any argument take place. She did not describe the men as arguing, yelling at each other, or even raising their voices at each other. Nor did she testify that the men appeared angry at one another. In fact, Detective Tucker testified that Sherry told him that the two men had been "picking and joking" with each other all night and that she "never heard anyone threaten the other." (Tp 1332)

Significantly, both Gail Brown *and* Sherry Strickland testified that they could not hear what the two men were saying to each other in the minutes before the shooting. For some period of time before the shooting, both women were in the kitchen cleaning the table and heating up food, while Strickland and Henry were in the living room. The kitchen of the trailer home in which the Stricklands lived was separated from the living room by a counter top/bar, not a wall. (Pet. Exh. 83; Tp 972) That arrangement allowed someone in the kitchen to see what was going on in the living room and *vice versa*. (Pet. Exh. 83, Tp 972) In fact, Gail testified that she witnessed the shooting as she was standing in the kitchen looking into the living room. (Tpp 972-

73)  As noted earlier, Gail testified at trial that she could not hear what the two men were saying before the shooting.  This is consistent with Sherry's version of events.  Sherry, who was in the kitchen with Gail, told Detective Tucker that when she and Gail were in the kitchen, Strickland and Henry were in the living room "just talking" but that she and Gail could not hear what they were saying. (Tp 1332)  Sherry testified that as she headed to the door to take a plate of scraps to the cats outside, she saw Henry mumbling something but could not hear what he was saying. (Tp 1260)  She testified further that she was outside for "five seconds at the most, if that long" when she heard the shot. (Tp 1249)  If the two men were arguing, they were quiet enough about it that Sherry could not hear them.

Petitioner has failed to show by clear and convincing evidence that the MAR court's finding was incorrect. 28 U.S.C. § 2254(e)(1).  There was ample evidence to support the state court's determination that "running their mouths at each other" meant something other than arguing and fighting.

Under the MAR court's finding, which this Court must accept as correct, Gail Brown's remark to Officer Keziah was neither exculpatory nor impeaching.  The MAR court's holding that Officer Keziah's report was not *Brady* material was not an unreasonable application of established Federal law.[5]  *Williams v. Taylor*, 529 U.S. at 410.

### 2) Gail Brown's January 2, 1995 Statement to Agent Underwood (Pet. Exh. 83)

Gail Brown was interviewed by SBI Special Agent Tony Underwood on January 2, 1995.

---

[5]This holding also applies to the comment by Gail Brown in Petitioner's Exhibit 88 -- Agent Underwood's synopsis of the case for the SBI.  The comment at issue in Exhibit 88 is the "running their mouths at each other" comment from Officer Keziah's report, which Agent Underwood included in his synopsis.  (Pet. Exh. 88)

(Pet. Exh. 83)  Strickland claims that this statement should have been turned over to his trial

counsel under *Brady v. Maryland* because it contained exculpatory evidence, impeaching

materials and inconsistent statements. 373 US at 87.  However, this claim is procedurally

defaulted because Petitioner failed to fairly present it to all appropriate state courts, and it would

be procedurally barred in the state courts if he attempted to raise it now.  *See Clagett v. Angelone*,

209 F.3d at 378.

Petitioner raised a *Brady* claim concerning Exhibit 83 for the first time as Claim V C (1)

in his Restated Amendment to the MAR.  (Pet. Exh. C)  In her January 2, 1995 statement, Gail

told Agent Underwood that her husband had assaulted her in the past. (Pet. Exh. C, p. 6, ¶ 238

(b))  Petitioner asserted that this was exculpatory evidence that should have been disclosed to

him pursuant to *Brady*.  This was the only portion of the January 2, 1995 statement alleged in the

MAR to be *Brady* material.  However, during the MAR hearing, post-conviction counsel

identified three additional portions of the January 2, 1995 statement that they argued should have

been disclosed to defense counsel under *Brady*.  Specifically, Gail told Agent Underwood, 1) that

she had told her husband on several occasions on the night of the murder that she wanted to leave

the Stricklands' home; 2) that the two men did not use drugs on the night of the murder; and 3)

that she could not hear what the two men were saying prior to the shooting, but they were not

arguing or yelling. (MAR Tpp. 39-41)

After the MAR court denied all of the claims raised in his MAR, Petitioner filed a

Petition for Writ of Certiorari to the North Carolina Supreme Court seeking discretionary review

of the MAR court's Order. (Pet. Exh. E)  In Claim I of his Petition for Writ of Certiorari,

Petitioner states only that the January 2, 1995 statement (Pet. Exh. 83) was "relevant, material

and favorable to Petitioner," because it "contradicted important parts of Gail Brown's trial testimony" and that it should have been turned over to trial counsel under *Brady*. (Pet. Exh. E, pp 8-9)  However, Petitioner failed to identify for the North Carolina Supreme Court's *any* portion of the January 2, 1995 statement that he believed was either exculpatory or that impeached Gail's testimony.[6]

In order to fully exhaust a claim in the state courts, a petitioner must fairly present his claim to the state's highest court.  *See Matthews v. Evatt*, 150 F.3d 907, 911 (4th Cir. 1997). "Fair presentation" requires that a petitioner present "both the operative facts and the 'controlling legal principles'" underlying the claim. *Id*. (citations omitted).  While it is clear that Petitioner cited the controlling legal principles, he did not present the North Carolina Supreme Court with the operative facts to support a claim that the January 2, 1995 statement (Pet. Exh. 83) should have been disclosed under *Brady*.

Petitioner argues that he fairly presented a *Brady* claim with regard to the January 2, 1995 statement (Pet. Exh. 83) when he referred to the statement in the body of the Petition for Writ of Certiorari, argued that it was relevant, material and favorable to Petitioner because it "contradicted important parts of Gail Brown's trial testimony," and attached copies of the statement, the MAR, the MAR hearing transcript and portions of the trial transcript to the Petition.  Petitioner argues that "fair presentation" of a claim requires nothing more.

As this Court understands Petitioner's argument, if the North Carolina Supreme Court

---

[6]In his July 25, 2005 brief on procedural default, Petitioner points to his reference in the Petition for Writ of Certiorari to Gail Brown's remark that Petitioner was saying that the gun had gone off accidentally on the night of the shooting.  However, Petitioner has made a factual error. That remark was made by Gail to Agent Underwood during their February 7, 1995 interview (Pet. Exh. 84) not during their January 2, 1995 interview (Pet. Exh. 83).

wanted to determine what claim was being raised, all it had to do was read the MAR, the MAR hearing transcript and Gail's trial testimony and compare those documents to her six (6) page January 2, 1995 statement to determine which portions of it Petitioner might consider exculpatory or impeaching evidence. However, the flaw in this argument becomes apparent when one considers the *Brady* claim raised in the instant Petition for Writ of Habeas Corpus.

In the instant Petition, Petitioner alleges that in addition to the four portions of the January 2, 1995 statement identified in the MAR and MAR hearing transcript as *Brady* material, *six* additional portions of the January 2, 1995 statement are exculpatory or impeaching evidence under *Brady*.[7] Under Petitioner's "fair presentation" argument, the state Supreme Court should have recognized that these additional portions were part of the *Brady* claim raised in the Petition for Writ of Certiorari even though it would have found no reference to them anywhere in the Petition or in the attached documents *except* in the January 2, 1995 statement. Taking Petitioner's argument to its logical conclusion, all that is required then to fairly present a *Brady*

_____

[7]In the instant Petition, Petitioner alleges for the first time that the following remarks are *Brady* material contained in Gail Brown's January statement (Pet. Exh.83):

1."Strickland and Henry Brown began drinking from a half gallon of gin."
2. "[Gail] and [Sherry] Jenkins [Strickland] thought it would be best if Henry and Eugene Strickland ate because they had been drinking alcohol."
3. "Henry was 'high' . . . [and] it does not take a lot for him to get 'high.' She . . . does not think Strickland was drunk, but she does think he was 'high'."
4. Gail had two drinks of gin all night and Sherry had one drink.
5. Around 9:30 p.m., Strickland told Sherry to take the gun outside and shoot it.
6. Henry was shot in the right side of his body.

Additionally, Petitioner for the first time throws in an assertion that the diagram of the scene of the shooting drawn by Gail Brown and attached to the January 2 statement "is different from the actual layout of the events and Gail Brown's testimony and, as such, is exculpatory information that should have been produced under *Brady*." (PWHC ¶ 291)

claim is a general reference to a document and the document itself because the state court on its own is capable of reading that document and determining for itself what the petitioner considers to be exculpatory and/or impeaching.

Such a reading of the "fair presentation" requirement cannot be supported. It is not the state court's responsibility to determine for itself what claim is being raised.[8] Instead, "fair presentation" of a claim requires that a petitioner present the state courts not only with his "legal theory as to why his constitutional rights have been violated, but also the factual predicate on which the legal theory rests." *See Landano v. Rafferty*, 897 F.2d 661, 670 (3rd Cir. 1990).

In this case, Petitioner failed to identify for the North Carolina Supreme Court any portion of Gail's January 2, 1995 statement that allegedly was either exculpatory or impeaching. As such, Petitioner failed to present the "operative facts" or "factual predicate" of a *Brady* claim with regard to the January 2, 1995 statement (Pet. Exh. 83). Therefore, Petitioner failed to exhaust his *Brady* claim with regard to the January 2, 1995 statement to Agent Underwood (Pet. Exh. 83). Furthermore, Petitioner would be barred in the State courts from bringing this claim if he attempted to do so now. *See* N.C. Gen. Stat. § 15A-1419(a); N.C. R. App. P. 21.

Petitioner has failed to demonstrate cause and prejudice to excuse his failure to fairly present this claim to the North Carolina Supreme Court. Furthermore, he has failed to show that

---

[8]During the evidentiary hearing, the MAR court attempted to impress this point upon post-conviction counsel during a discussion about what constituted a statement under state law versus what constituted *Brady* material. The court pointed out that there was a difference between alleging that something was a statement under state law and alleging that something was *Brady* material. The court required post-conviction counsel to identify the exculpatory and impeaching evidence contained within Exhibits 83 (six pages) and 84 (three pages). It was at that point that post-conviction counsel identified the three additional portions of the January 2, 1995 statement (Exh. 83) not previously identified in the MAR as *Brady* material. (MAR Tpp 26; 39-41)

a fundamental miscarriage of justice would occur if the Court refused to address this claim on the merits. Therefore, this claim is procedurally defaulted. *See Fisher v. Angelone*, 163 F.3d at 844.

### 3) Gail Brown's February 7, 1995 Statement to Agent Underwood (Pet. Exh. 84)

Strickland argues that Gail Brown's February 7, 1995 statement (hereinafter "February statement") to Agent Underwood (Pet. Exh. 84) contains evidence supporting his defense at trial that the shooting was an accident. Gail told Agent Underwood that she called Sherry after the shooting to ask her about rumors that she had been hearing. Gail informed Agent Underwood that her brother-in-law, James Massey, had told her that "Squeaky" was saying that the gun had gone off by accident.[9]

The MAR court denied this claim on the merits and held that it was procedurally barred by N.C. Gen. Stat. § 15A-1419(a)(2) because Strickland had raised the substance of the claim on direct appeal.[10] Because the MAR court invoked a state *res judicata* rule in declining to review this claim, the relevant decision for federal habeas purposes is that of the North Carolina Supreme Court on direct review.[11] *See Goins v. Angelone*, 226 F.3d 312, 320 (4th Cir. 2000)

---

[9]"Squeaky" or "Squeak" are Petitioner's nicknames.

[10]Section 15A-1419(a)(2) requires an MAR court to deny a claim if the grounds or issue was previously determined on the merits on direct review. *See* §§ 15A-1419(a)(2) & (b). Section 15A-1419(a)(2) is a codification of the rule of *res judicata* -- if one state court considers a claim or issue on the merits, the claimant is not entitled to a second bite at the apple in the state judicial system. *See Brown v. Lee*, 319 F.3d 162, 170 n. 2 (4th Cir. 2003). Thus, although § 15A-1419(a)(2) is an adequate and independent state procedural rule, it is not a state procedural bar that prevents federal habeas review. *See Page v. Lee*, 337 F.3d 411, 415 n. 1 (4th Cir. 2003) (citing *Smith v. Dixon*, 996 F.2d 667, 674 n. 10 (4th Cir.1993)).

[11]Although the MAR court did a merits review after finding that this issue was procedurally barred, this Court is bound by the procedural ruling. *See Ashe v. Styles*, *supra*, 39 F.3d at 86 (Where a state court "both addresses the merits of the federal question but also invokes a state procedural bar that is adequate and independent of federal law as an independent

*abrogated on other grounds by*, *Bell v. Jarvis*, 236 F.3d 139 (4ᵗʰ Cir. 2000); *Ramdass v.*

*Angelone*, 187 F.3d 396, 402 (4ᵗʰ Cir. 1999).

The record shows that during pre-trial discovery, the State disclosed to defense counsel that Strickland had told an individual that the gun had gone off by accident, but the State did not disclose James Massey's name or the fact that the information was given by Gail to Agent Underwood. (Pet. Exh. 34, Attachment: Substance of Oral Statements made by defendant Darrell Eugene Strickland) Trial counsel made several motions to require the State to disclose the name of the person to whom Petitioner had said that the gun had gone off accidently, but the trial court ruled that the State had complied with the statutory discovery procedure by providing Strickland with the substance of all oral statements made by him.

On direct appeal, Petitioner claimed error on the part of both the State and the trial court and argued that pursuant to *Brady v. Maryland*, he was entitled to the name of the person to whom he allegedly had stated that the gun had gone off accidently. (Defendant-Appellant's Brief to the North Carolina Supreme Court (Pet. Exhibit A), Issue VI, pp. 65-69) The North Carolina Supreme Court rejected Petitioner's *Brady* claim on the merits. *State v. Strickland*, 488 S.E.2d at 201-202. Of paramount importance to the court was the fact that Strickland was aware of the substance of the statement and that it was made by him. *See id*. at 202. The court held that Strickland "is presumed to know to whom he spoke about the murder." *Id*. Additionally, the court concluded that the substance of the statement was not material because the overwhelming evidence presented at trial showed that Strickland shot Henry Brown intentionally. *See id*. Therefore, the court determined that it was not reasonably probable that the outcome of the trial

_____

ground for decision, a federal court must accord respect to the state ground for decision . . . .").

would have been different had the prosecution disclosed the name of the individual to whom Strickland allegedly spoke. *See id*.

In determining whether the North Carolina Supreme court's adjudication of Petitioner's *Brady* claim was "objectively unreasonable," *see Williams*, 529 U.S. at 409, this Court need not reach the issue of materiality. *Brady* "does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." *Stockton v. Murray,* 41 F.3d 920, 927 (4th Cir. 1994) (citing *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990)). If evidence available to the defendant from other sources falls outside of *Brady* then, by extension, evidence actually known to the defendant also must fall outside the *Brady* rule. *See Fullwood v Lee*, 290 F.3d 663, 686 (4th Cir. 2002). In *Fullwood*, the prosecution failed to disclose an oral statement Fullwood had made to a detective in which he admitted killing the victim but claimed he had been using cocaine and had lost control. *Id*. at 685. Fullwood argued that this statement was material under *Brady* because it would have afforded him a diminished capacity defense and mitigated his crime from first to second-degree murder. The Fourth Circuit held that the State did not suppress the information that came out during the conversation between Fullwood and the detective because "Fullwood, better than anyone, knew about his cocaine use on the night prior to the stabbing and knew that he had recounted this fact to Detective Robinson." *Id*. at 686.

The State disclosed that Strickland had told at least one person that the shooting was an accident. Strickland is presumed to know, better than anyone, to whom he spoke about the shooting. *See id*. Petitioner cannot show that the State suppressed evidence that he had told someone that the gun went off accidently. *See Strickler v. Greene*, *supra*, 527 U.S. at 282.

Therefore, the North Carolina Supreme Court's conclusion that *Brady* did not require disclosure of the name of the person to whom Strickland allegedly stated that the gun had gone off accidently was not an unreasonable application of established Federal law. *See* § 2254(d)(1).

In the instant Petition, Strickland also argues that there was evidence in Gail Brown's February statement that she herself was a suspect, thereby giving her a motive to lie. Gail told Agent Underwood that "there was not a conspiracy between her, Sherry Jenkins, and 'Squeaky' to kill Henry," and that she was willing to submit to a polygraph examination at the Union County Sheriff's Department. (Pet. Exh. 84) Petitioner raised this portion of his *Brady* claim in state court by way of his Restated Amendment to the MAR (p. 7, ¶ 238(c)) and during the MAR hearing (MAR Tpp 26; 39-41).[12] The MAR court did not address this portion of Petitioner's claim; therefore, this Court's review is *de novo*.

Petitioner fails to articulate how or why this information was either exculpatory or impeaching evidence. It certainly is not exculpatory because any evidence of a conspiracy between Gail, Sherry and Petitioner would put Petitioner's shooting of Henry Brown squarely

---

[12]In the instant Petition, Petitioner asserts that three other portions of Gail's February statement are exculpatory or impeaching evidence that should have been disclosed under *Brady*. Two portions state that Gail reviewed both her January 2 and February 7 statements for accuracy and to be sure she did not leave anything out. In both cases she told Agent Underwood that the information in them was correct. The third portion relates a story Gail told Agent Underwood about test driving a pickup truck with her brother. Petitioner did not identify any of these portions of the February 7, 1995 statement as *Brady* material in his MAR, at his MAR hearing or in his Petition for Writ of Certiorari.

For the sake of argument only, the Court will assume that these additional portions are properly before it. However, Petitioner has failed to put forth any argument as to why this information is either exculpatory or impeaching evidence. This Court is not required to construct Petitioner's legal arguments for him. *See Small v. Endicott*, 998 F.2d 411, 418 (7th Cir. 1993). With regard to these portions of the February statement, Petitioner has presented nothing more than conclusory assertions that are insufficient to support a claim under *Brady v. Maryland*.

and unquestionably in the category of first-degree murder.  Nor is it clear how this evidence impeaches any of Gail's testimony.  For example, Petitioner fails to put forth any argument explaining what Gail would have been motivated to lie about if she was viewed as suspect. While it can be argued that the implication that Gail Brown might have been a suspect in the murder could have caused the jury to question her credibility, that still does not undermine the Court's confidence in the jury's verdict. *See Strickler v. Green*, 527 U.S. at 282.

As the North Carolina Supreme Court and the MAR court noted, evidence against Strickland was "overwhelming."  *Strickland*, 448 S.E.2d at 202.  Undermining Gail Brown's credibility does not call into question that Strickland shot Henry Brown in the back while Brown was seated.  Sherry Strickland testified that after the shot, Henry fell sideways off the ottoman on which he was seated (Tpp 1248-49), and the medical examiner determined that Henry was shot in the back by someone standing over him while Henry was seated and slouched forward. (Tp 1081)  Undermining Gail Brown's credibility does not change Strickland's statements to the police that he had shot Henry because Henry had "pissed him off," had called him a "punk-ass Indian son-of-a-bitch," and that he "meant to kill him." (Tp 1210)  Nor does it undermine Strickland's statement to law enforcement that he stood close to Henry when he shot him because he didn't want to miss him, and that he had to cock the gun to get it to shoot. (Tp 1210)

The jury was given instructions for First-Degree Murder, Second-Degree Murder, Voluntary Manslaughter and Involuntary Manslaughter.  Among the evidence before it, the jury had the manner in which Henry had been shot, as well as Sherry's testimony of obnoxious, offensive behavior by Henry and Strickland's explanation to police that he shot Henry because Henry had used a racial slur.  The jury also heard evidence that both men had been drinking and

using drugs in the hours before the shooting. In fact, the jury heard that Henry's blood alcohol content was .18 at the time of the shooting. (Tp 1080) The jury returned a verdict of First Degree Murder. This Court cannot say that undermining or completely discrediting Gail Brown's testimony would have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. at 435. The MAR court's holding that the State's failure to disclose Gail Brown's February 7, 1995 statement (Pet. Exh. 84) was not prejudicial to Strickland's trial was not an unreasonable application of established Federal law.

### Penalty Phase

This Court likewise finds that Strickland's claim that the State's failure to disclose Officer Keziah's report (Pet. Exh. 82) and Gail Brown's February statement (Pet. Exh. 84) prejudiced the outcome of his sentencing to be without merit.[13] Strickland argues that he raised this claim in his Restated Amendment to the Motion for Appropriate Relief, and that the MAR court failed to address it on the merits.[14] Therefore, Strickland argues, this Court must review the claim *de novo*.

The Court notes that to the extent that the MAR court did not address the *Brady* issue as it applied to the penalty phase, the blame can hardly be laid at the feet of the court. First, it is

---

[13]Petitioner raises the same claim with regard to Gail Brown's January 2, 1995 statement (Pet. Exh. 83). However, for the reasons discussed in section I A(2), pp. 18-22 of this Order, this portion of the claim is procedurally defaulted.

[14]Respondent did not acknowledge this assertion by Petitioner or address Petitioner's *Brady* claim with regard to sentencing until this Court issued its second Order requiring the parties to brief the issue of procedural default.

less than clear that Strickland raised this *Brady* claim during his collateral attack.[15]  Second, the

MAR court asked post-conviction counsel several times if Petitioner's *Brady* claim applied *only*

to the guilt/innocence phase, and each time the answer was in the affirmative.[16]  However, giving

Petitioner the benefit of the doubt about whether he fairly presented a *Brady* claim relating to the

penalty phase of the trial, this Court finds that the State's failure to disclose Officer Keziah's

report and Gail Brown's February statement (Pet. Exh. 84) did not violate the requirements of

*Brady v. Maryland* as it is applied at sentencing..

　　　　As an initial matter, this Court is not required to review Petitioner's claim *de novo*

because, for the most part, the MAR court's analysis of Petitioner's *Brady* claims applies equally

to the guilt/innocence and the sentencing phases of the trial.  The MAR court made a factual

finding that Gail Brown's remark to Officer Keziah that the two men were "running their mouths

at each other" meant something other than arguing or fighting.  Therefore, the remark was neither

exculpatory nor impeaching evidence, and the State was not required to disclose it under *Brady*.

373 US at 87.  The MAR court's finding of fact applies equally to the guilt/innocence and

---

[15]See Petitioner's July 25, 2005 brief on procedural default for his arguments that he did raise this claim in the state courts.

[16]During the evidentiary hearing on the motion for appropriate relief, the following exchange took place regarding the alleged *Brady* material:
>  *Court*: Let me clear up one thing.  Your point as to the statement [to Agent Underwood] goes to the outcome of the guilt/innocence phase.  Is that correct?
>  *Ms. Nichols*: (post-conviction counsel for petitioner): Yes, Your Honor.
>  *Court*: And so then the only thing we're considering on the punishment phase is whether or not the doctor would have testified as to the mitigating factors.  Is that correct?
>  *Mr. Freeman*: (post-conviction counsel for petitioner): Yes, Your Honor.
>  *Court*: One of the arguments goes to the guilt/innocence; the other one goes to the punishment.  That's it.  Is that correct?
>  *Mr. Freeman*: Yes, Your Honor.

(MAR Tpp 164-165)

penalty phases of the trial. In other words, "running their mouths at each other" would not have meant one thing at the trial and something else at sentencing. Thus, if the remark was not exculpatory or impeaching evidence for the purposes of the trial, it was not exculpatory or impeaching evidence for the purposes of the sentencing proceeding.

With regard to Gail Brown's February statement, the MAR court concluded that Gail's revelation to Agent Underwood that James Massey had told her that Strickland was saying that the gun had gone off by accident was not suppressed by the State because the identity of the man to whom Strickland spoke about the shooting was available from other sources, including Strickland himself.[17] (MAR Order, p.18) Although this conclusion addressed Petitioner's claim regarding the guilt/innocence portion of the trial, it applies equally to the penalty phase. *See Fullwood*, 290 F.3d at 686; *Stockton*, 41 F.3d at 927. In this case, whether the State suppressed the evidence is not dependent upon which phase of the trial is at issue; either the State suppressed the evidence or it did not, and in this case, it did not. If the State did not suppress the evidence, there is no *Brady* violation. *See Strickler v. Greene*, 527 U.S. at 282.

All that remains for the Court to address, then, is Petitioner's assertion that Gail's February statement (Pet. Exh. 88) contained evidence that she herself was a suspect. As noted previously, Petitioner fails to articulate how or why this information was either exculpatory or impeaching evidence. Nor does he indicate how this information was material to his case at sentencing. The Court notes that Gail did not testify at the sentencing phase of the trial. However, assuming as before that this information raises an issue with regard to Gail's

---

[17]In his direct appeal, Strickland did not raise a *Brady* claim with regard to sentencing. Therefore, to the extent that Petitioner raised a *Brady* claim with regard to sentencing during the MAR process, the Court looks to the MAR court's merits review.

credibility, the Court concludes that the State's failure to disclose this information did not prejudice the outcome of the penalty phase of the trial. *See id*.

During the penalty phase, the State offered one aggravating circumstance – that Strickland previously had been convicted of a felony involving the use of violence to the person. *See* § 15A-2000(e)(3). Jurors heard evidence that Strickland had been convicted of voluntary manslaughter for shooting a man outside a bar. Jurors also heard evidence that Strickland had been convicted of assault with a deadly weapon inflicting serious injury for cutting a man down the back with a knife. Jurors unanimously found as an aggravating circumstance that Strickland previously had been convicted of a felony involving the use of violence to the person. The jury did not find any mitigating circumstances.

Undermining Gail Brown's credibility would not have called into question or impacted the strength of the State's aggravating factor. Furthermore, in addition to the evidence of Strickland's prior acts of violence against others, the jury had all of the evidence from the trial to consider. The jury heard evidence that Strickland got up from a seated position, walked past Henry Brown to his gun cabinet, opened it, took out the shotgun and cocked it. Then, because he did not want to miss, he stood at close range behind Henry Brown and shot him in the back as he sat slouched forward with his coat over his knees. The jury also heard Petitioner's confession to Agent Underwood that he had shot Henry because Henry had "pissed him off" by calling him a "punk-ass Indian son-of-a-bitch.." (Tp 1210) Additionally, Sherry Strickland testified that she saw Henry's lips moving as she passed through the living room seconds before the shooting. While the jury easily could have concluded that Henry Brown said something to anger Petitioner, the uncontroverted evidence showed that from the time Strickland stood up until the time he shot

Henry Brown, Brown did not stand up or turn around. Thus, there was no evidence that the two men were involved in any kind of physical confrontation at the time that Petitioner shot Henry in the back. The jury heard this evidence from witnesses other than Gail Brown.

The fact that Gail Brown might have been a suspect, however briefly, does not "put the whole case in such a different light as to undermine confidence" in the sentence. *Kyles v. Whitley*, 514 U.S. at 435. Therefore, the State's failure to disclose Gail Brown's February 7, 1995 statement to Agent Underwood (Pet. Exh. 84) was not a violation of *Brady*. 373 US at 87.

**CLAIM IB:** ***NAPUE V. ILLINOIS* CLAIMS**

### 1) Officer Keziah's Report (Pet. Exh. 82)

Petitioner claims that Gail Brown testified untruthfully at trial and that the prosecution knew she testified untruthfully but failed to correct her false testimony in violation of *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Specifically, Petitioner alleges that Gail's trial testimony that Strickland and Henry Brown did not argue or fight on the night of the shooting was false in light of her comment to Officer Keziah that the two men were "running their mouths at each other" before the shooting. (Pet. Exh. 82; 88) Petitioner claims that the State's failure to correct Gail's false evidence deprived him of his Sixth, Eighth and Fourteenth Amendment rights.

In *Napue v. Illinois*, the U.S. Supreme Court held that under the due process clause of the 14th Amendment, a State may not knowingly use false evidence to obtain a conviction. 360 U.S. 264, 269, 79 S.Ct. 1173, 1177 (1959) (citations omitted). This applies equally to situations where the State deliberately elicits false testimony and where the State, although not soliciting false evidence, allows it to go uncorrected. *Id.* (citations omitted). Nor does the rule "cease to apply merely because the false testimony goes only to the credibility of the witness," rather than

directly to the guilt of the defendant. *Id*. However, *Napue* and its progeny do not automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . ." *Giglio v. U.S.*, 405 U.S. 150, 154, 92 S.Ct. ;763, 766 (1972) (citing *U.S. v. Keogh*, 391 F.2d 138, 148 (2nd Cir. 1968)). Instead, a new trial is warranted if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Napue*, 360 U.S. at 271, 79 S.Ct. at 1178.

The MAR court found Strickland's false evidence claim to be without merit for the same reason it rejected Strickland's *Brady* claim with regard to Exhibit 82. In its adjudication of Petitioner's *Brady* claim, the court made a factual finding that Gail's use of the term "running their mouths at each other" did not mean that the two men were arguing or fighting. Therefore, the court concluded that Gail's testimony that there was no arguing or fighting between the two men did not contradict her comment to Officer Keziah that Strickland and Henry Brown were "running their mouths" at each other. There being no contradiction between her testimony and her comment to Officer Keziah, the court concluded there was no *Napue* violation. Because the MAR court correctly identified the governing legal standard as that set forth in *Napue v. Illinois*, 360 U.S. at 269, this Court's review is limited to the question of whether that court's application of *Napue* was "objectively unreasonable." *See Williams*, 529 U.S. at 409, 120 S.Ct. 1495.

For the reasons articulated in the section of this Order addressing Strickland's *Brady* claim with regard to Exhibit 82, this Court concludes that the MAR court's holding with regard to this claim was not an unreasonable application of clearly established Federal law.[18] *See* §

---

[18]This holding also applies to the comment by Gail Brown in Petitioner's Exhibit 88 -- Agent Underwood's synopsis of the case for the SBI. The comment at issue in Exhibit 88 is the "running their mouths at each other" comment from Officer Keziah's report, which Agent

2254(d).  As previously noted, "running their mouths at each other" is an ambiguous expression.
There is ample evidence in the record to support the MAR court's determination that the
expression meant something other than arguing or fighting.

Although he does not put forth any argument regarding how he was prejudiced at
sentencing, Petitioner does cite the Eighth Amendment in this claim, thereby implying that he is
raising a claim regarding sentencing.  As explained in the previous section of this Order, the
MAR court's holding in this claim applies equally to the trial and sentencing proceedings.  If
Gail Brown's testimony was not false at the trial, it also would not have been false at sentencing.
Therefore, to the extent that Petitioner is raising a *Napue* claim with regard to sentencing, the
MAR court's adjudication of this claim was not an unreasonable application of clearly
established Federal law. *See* § 2254(d)(1).

### 2) Gail Brown's January 2, 1995 Statement to Agent Underwood (Pet. Exh. 83)

Petitioner alleges that Gail Brown's trial testimony contradicted a number of things she
told Agent Underwood during her January 2, 1995 interview (Pet. Exh. 83) and that the
prosecution knew she testified untruthfully but failed to correct her false testimony in violation of
*Napue*. 360 U.S. at 269.  Specifically, Petitioner alleges that Gail Brown's testimony contradicted
the following comments that she made in her January 2, 1995 statement:

> Henry Brown and Strickland were talking but she could not hear what they were
> saying.  They were not arguing or yelling.
>
> She had been trying to get her husband to leave on and off all evening because she
> did not want to spend the night at someone else's house.
>
> To her knowledge, Henry and Strickland were drinking gin but were not using

___

Underwood included in his synopsis.  (Pet. Exh. 88)

drugs.

Henry was shot in the right side of his body.

Henry and Strickland have used marijuana together in the past but they were not using it on the night of the shooting. She did not think Henry had any drugs on him.

(PWHC, pp. 77-78 *citing* Pet. Exh. 83)

Petitioner complains that the MAR court failed to address his *Napue* claim with respect to the January 2, 1995 statement (Pet. Exh. 83).[19] The MAR court did not address this claim for the very simple reason that Petitioner failed to fairly present a *Napue* claim with regard to the January 2, 1995 statement.

In Claim V C(2) of his Second Amendment to his MAR, Petitioner stated the following:

[A]s more fully set out above in Defendant's Restated Amendment in Paragraphs 247 through 254, the failure of the State to correct the false evidence offered by Ms. Brown at trial as evidenced by Exhibits 80, 82, 83, 84, 88 and 89, violated Mr. Strickland's rights under *Napue v. Illinois*, 36 U.S. 264 (1959), the Eighth and Fourteenth Amendments to the United States Constitution and Article I §§ 19 and 27 of the North Carolina Constitution.

(Pet. Exh. D, ¶ 281) A review of paragraphs 247-254 of Petitioner's Restated Amendment to the MAR reveals that the only "false evidence" allegation in those paragraphs refers to the comment Gail Brown made to Officer Keziah (Pet. Exh. 82) that Henry Brown and Strickland were"running their mouths at each other."

In his July 25, 2005 brief on procedural default, Petitioner acknowledges that he did not raise a *Napue* claim with regard to Gail Brown's January 2, 1995 statement anywhere in his

_____

[19]Respondent did not acknowledge this assertion by Petitioner or address Petitioner's *Napue* claim with regard to Exhibit 83 until this Court issued its second Order requiring the parties to brief the issue of procedural default.

MAR pleadings. However, he argues that he supplemented his pleadings during the MAR hearing by referring to *Napue v. Illinois* in conjunction with his arguments on his *Brady* claims. Even if the Court was to accept Petitioner's argument that this was sufficient to "fairly present" a *Napue* claim with regard to the January 2, 1995 statement,[20] such an argument would apply only to Gail Brown's statements that she had been trying to get her husband to leave off and on all evening; that the two men were drinking but not using drugs on the night of the murder; and that the two men were not arguing or fighting before the shooting because those were the only portions of the January 2, 1995 statement identified as *Brady* material by post-conviction counsel during the MAR hearing. (MAR Tr. pp. 39-41)

Regardless, Petitioner did not fairly present a *Napue* claim with regard to any portion of the January 2, 1995 statement (Pet. Exh. 83) in his Petition for Writ of Certiorari to the North Carolina Supreme Court, a fact which Petitioner acknowledges. (July 25, 2005 Brief on Proc. Dflt.) Indeed, Claim II of the Petition for Writ of Certiorari makes no mention whatsoever of Gail Brown's January 2, 1995 statement to Agent Underwood (Pet. Exh. 83). (Pet. Exh. E, pp. 10-11) The only allegation of "false evidence" in Claim II involves Gail Brown's comment to Officer Keziah (Pet. Exh. 82) that Henry Brown and Strickland were "running their mouths at each other." Thus, Petitioner failed to present the North Carolina Supreme Court with the "operative facts" or "controlling legal principles" of a *Napue* claim with regard to the January 2,

_____

[20]Under North Carolina law, new claims must be raised by way of amendments to the MAR. *See* N.C. Gen. Stat. § 15A-1415(g). Furthermore, after a hearing on the merits of an MAR has begun, "the defendant may file amendments only to conform the motion to evidence adduced at the hearing, or to raise claims based on such evidence." *Id*. There is no evidence in the record that after his post-conviction hearing, Petitioner moved to amend his MAR either to conform it to evidence adduced at the hearing or to raise claims based on such evidence.

1995 statement (Pet. Exh. 83).  *See Matthews v. Evatt*, 150 F.3d at 911.

Petitioner's *Napue* claim as it applies to the January 2, 1995 statement (Pet. Exh. 83) has not been exhausted in the State courts.  Furthermore, Petitioner would be barred in the State courts from bringing this claim if he attempted to do so now.  *See* N.C. Gen. Stat. § 15A-1419(a); N.C. R. App. P. 21.

Petitioner has failed to demonstrate cause and prejudice to excuse his failure to fairly present this claim to the North Carolina courts.  Furthermore, he has failed to show that a fundamental miscarriage of justice would occur if the Court refused to address this claim on the merits.  In fact, Petitioner acknowledges that this claim was not exhausted and is procedurally barred in this Court.  (July 25, 2005 Brief on Proc. Dflt., p. 16)  Therefore, Petitioner's *Napue* claim with regard to Gail Brown's January 2, 1995 statement to Agent Underwood is procedurally defaulted.[21]  *See Fisher v. Angelone*, 163 F.3d at 844.

### 3) Gail Brown's February 7, 1995 Statement to Agent Underwood (Pet. Exh. 84)

Petitioner has not raised a *Napue* claim in the instant Petition with regard to Gail Brown's February statement to Agent Underwood (Pet. Exh. 84).

## CLAIM II: INEFFECTIVE ASSISTANCE OF COUNSEL AT GUILT/INNOCENCE PHASE

---

[21]With one exception, this holding also applies to Petitioner's Exhibit 88, Agent Underwood's synopsis of the case for the SBI.  Exhibit 88 cites Officer Keziah's report that Gail Brown stated that the two men were "running their mouths at each other" before the shooting. Only that portion of Exhibit 88 is properly before the Court.  The Court addressed that portion of Exhibit 88 previously at page 33, note 18 of this Order.

Petitioner claims that trial counsel were ineffective at the guilt/innocence phase of the trial for failing to question Gail Brown about statements she allegedly made to Sherry Strickland indicating that she did not actually see the shooting and that she was being pressured by Henry Brown's family not to testify in a way that would benefit Petitioner. Petitioner claims that trial counsel's failure to cross-examine Gail on these two points violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

Petitioner raised this claim in his MAR (Claim A 2(a)) and in his Petition for Writ of Certiorari to the North Carolina Supreme Court (Claim V). The MAR court denied the claim on the merits. (MAR Order p. 5-7) Because the MAR court correctly identified the governing legal standard as that set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), this Court's review is limited to the question of whether that court's application of *Strickland* was "objectively unreasonable." *See Williams*, 529 U.S. at 409, 120 S.Ct. 1495.

The *Strickland* court articulated a two-pronged test to determine whether "counsel's assistance was so defective as to require reversal of a conviction or death sentence." 466 U.S. at 686-87. Petitioner must first show that counsel's representation was deficient and must next show that counsel's errors prejudiced the defense so seriously "as to deprive the Defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial can not be relied on as having produced a just result." *Id* at 686.

Under the *Strickland* standard of review for determining whether trial counsel's performance was deficient, this court's scrutiny of trial counsel's performance must be highly deferential. *Id.* The test is not whether petitioner's new lawyers, with the benefit of hindsight,

would have acted differently, but whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. "'Deficient performance' is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." *Griffin v. Warden*, 970 F.2d 1355, 1357 (4th Cir. 1992).

Even if a court concludes that counsel's performance was deficient, the court may not set aside a verdict or sentence if the error "had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Instead, the claimant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

During the MAR hearing, Sherry Strickland testified that prior to trial she told Petitioner's trial attorney, Harry Crow, that when she stepped back inside the trailer immediately after the shooting, she heard Gail asking, "What happened? What happened?" (MAR Tp 98) Additionally, Sherry testified that a few weeks before trial she met Gail for dinner and that they talked about what Gail would say at trial. (MAR Tp 99) According to Sherry, "[Gail] didn't know what happened." (MAR Tp 99) Sherry also testified that Gail told her that she was afraid of Henry Brown's family and that, "[t]hey were kind of threatening her to not even sit near [Petitioner] in the courtroom, . . . . So that she wouldn't seem like she was trying to help him in any way." (MAR Tp 100). The MAR court admitted all of this hearsay evidence, not for its truth, but solely for the purpose of showing that Sherry had told attorney Crow about the

conversation she had with Gail.[22] (MAR Tpp 98-99)

For his part, Harry Crow testified at the MAR hearing that he recalled Sherry telling him prior to trial that Gail had told her that she did not see what had happened the night of the shooting. (MAR Tp 47)  He also testified that he recalled Sherry telling him that, "Gail had told her she was fearful that Mr. Brown's family might do something to her if she testified for the defendant." (MAR Tp 47)  Mr. Crow did not -- nor was he asked to -- explain why he did not question either Gail or Sherry at trial about Gail's statements to Sherry.

The MAR court held that counsel's failure to question Gail at trial regarding these two issues was not ineffective.  (MAR Order p. 6)  The court stated that Crow properly cross-examined Gail at trial.  The court also held that even if counsel's performance was deficient, it was not prejudicial because "the record reflects that Gail Brown testified at trial that she did not see defendant shoot her husband, but that she observed the victim fall over after she heard the gunshot."  (MAR Order p. 7)

As noted previously, a finding of fact by a state court is presumptively correct absent clear and convincing evidence to the contrary. § 2254(e)(1).  In this matter, the MAR court's finding that Gail Brown testified at trial that she did not see Petitioner shoot her husband is clearly erroneous. *See id*.

The record reflects that Gail testified that she *did* see Petitioner shoot her husband.  Under direct examination, Gail testified that she was in the kitchen and that when she turned around to face the living room she saw her husband sitting on an ottoman with his head in his hands. (Tp 974)  Petitioner was standing to "the back side" of her husband. (Tp 974)  Petitioner was pointing

---

[22]Gail did not testify at the MAR hearing.

a shotgun at her husband. (Tp 974) She could not hear what Petitioner was saying but could see his lips moving. (Tp 974) "Then it was just boom, you know. It was over just as quick as I turned around and looked." (Tpp 974-75) When asked what she saw happen when the gun fired, Gail responded that she smelled burning flesh and saw her husband fall over. (Tp 975) On cross-examination, Gail testified that from the kitchen, she could see Petitioner's lips moving right before he shot her husband but could not hear what he was saying from that distance. (Tp 1004)

Gail Brown's trial testimony was that she was looking at Petitioner and her husband when the shooting occurred. Thus, the MAR court's determination that Petitioner was not prejudiced because Gail did not testify that she saw the shooting was based upon an unreasonable determination of the facts in light of the evidence. *See* § 2254(d)(2). However, Petitioner is not entitled to relief. The MAR court's ultimate conclusion that there was no prejudice was not unreasonable under *Strickland*.

During Petitioner's trial, Sherry Strickland testified on direct examination that when she reentered the trailer after hearing the gunshot, Gail was looking out of the kitchen window, not into the living room where the shooting took place. Sherry testified that Gail then turned around and "hollered," "What happened?" (Tp 1249) Thus, the jury heard evidence that contradicted Gail's testimony that she was looking at the two men when Petitioner shot the victim. However, even if the jury questioned Gail's credibility based on Sherry's testimony, the independent evidence of Petitioner's guilt was overwhelming. The uncontroverted evidence shows that as Sherry went towards the door of the trailer home, Henry was seated on the ottoman looking straight ahead, and Petitioner was walking beside the ottoman. (Tp 1248) Sherry was outside for "five seconds at the most, if that long" when she heard the shot. (Tp 1249) As she stepped back

in the trailer she saw "Henry . . . sitting on the edge of the ottoman and he was falling over to his left." (Tp 1249)  She testified that when she glanced back up at Strickland, he was shutting the case where the gun was kept. (Tp 1250)

It is clear from Sherry's testimony that Henry had not moved from his seated position on the ottoman between the time she stepped out of the trailer and the time that he was shot.  Sherry also testified that on her way out, she saw Henry mumbling something but could not hear what he was saying. (Tp 1260)  The medical examiner testified that Henry was shot in the back by someone standing over him while Henry was seated and slouched forward. (Tp 1081)

Whether Gail actually saw the shooting or whether she was pressured to testify in a way that did not favor Petitioner would not have influenced how the jury viewed Strickland's own damning statements to law enforcement.  Strickland told Agent Underwood and Detective Tucker that he had shot Henry because Henry had "pissed him off," had called him a "punk-ass Indian son-of-a-bitch," and that he (Strickland) had "meant to kill him." (Tp 1210)  Strickland also told them that he stood close to Henry when he shot him because he didn't want to miss him, and that he had to cock the gun to get it to shoot. (Tp 1210)  When asked if Henry had a gun or knife on him, Strickland responded, "Not that I know of." (Tp 1209)

Based upon the overwhelming evidence of guilt that either corroborated Gail's testimony or existed separate and apart from her testimony, the Court concludes that Petitioner was not prejudiced by trial counsel's failure to cross-examine Gail Brown about whether she actually saw the shooting or whether she had been threatened by the victim's family not to testify in a way that was favorable to Petitioner.  Therefore, the MAR court's rejection of this ineffective assistance of counsel (hereinafter sometimes "IAC") claim was not an unreasonable application of

established Federal law. *See* § 2254(d)(1).

### *Penalty Phase*

At one point in his presentation of this claim, Petitioner cites the Eighth Amendment. Later, he asserts that counsel's failure to cross-examine Gail Brown during the guilt/innocence phase regarding whether she in fact witnessed the shooting of the victim and whether the victim's family was pressuring her to testify a certain way prejudiced the outcome of the sentencing phase of his trial. To the extent that Petitioner is raising an IAC claim alleging prejudice at sentencing when counsel failed to cross-examine Gail Brown during the guilt/ innocence phase of the trial, such a claim is procedurally barred on federal habeas review.

It does not appear that Petitioner fairly presented an IAC claim to the MAR court alleging that he was prejudiced at sentencing by counsel's failure to cross-examine Gail Brown at the guilt/innocence phase of the trial.[23] As Petitioner acknowledges in the instant Petition, "[t]his claim was raised in the MAR, as an ineffective assistance of counsel during the guilt phase issue." (PWHC, p. 87, ¶ 372, *citing* Pet. Exh. B, *Motion for Appropriate Relief*, ¶ 198(a)) A review of the MAR indicates that Petitioner raised his IAC claim under the heading "Ineffective Assistance of Counsel during Guilt Phase," argued only that the outcome of the *trial* would have been different but for counsel's ineffectiveness, and sought only vacation of his *conviction* and a new *trial*. (Pet. Exh. B, Claim V A(2), pp. 54; 56 ¶ 200; 59 ¶ 211) Nowhere does Petitioner

---

[23]Petitioner was given an opportunity to address procedural default with regard to this claim. (June 14, 2005 Order, p. 4) However, it appears that Petitioner misread this Court's Order, because he argued only that he had fairly presented a claim that he was prejudiced at the guilt/innocence phase of the trial, an issue the Court had not asked him to address. He failed to address whether he had fairly presented an IAC claim alleging that he was prejudice at sentencing. (July 25, 2005 Brief on Proc. Dflt.)

argue that he was prejudiced at sentencing by counsel's failure to cross-examine Gail during the guilt phase of the trial about her conversation with Sherry and her fear of the victim's family.

Furthermore, Petitioner raised a number of IAC claims in the MAR under the heading "Ineffective Assistance of Counsel during Sentencing Phase" in which he argued that but for counsels' errors the outcome of the *sentencing hearing* would have been different and in which he sought vacation of his *sentence of death* and a new *sentencing hearing*. Petitioner does not raise a claim under this section alleging that he was prejudiced by counsels' failure to cross-examine Gail at the guilt phase of the trial about her conversation with Sherry and her fear of the victim's family. By way of contrast, Petitioner's claim that counsel were ineffective for failing to inform their mental health expert of Gail and Sherry's trial testimony regarding Petitioner's alcohol and drug consumption appears under *both* IAC sections in the MAR. (Pet. Exh. B, p. 55 ¶ 198(b) and p. 60 ¶214 (d), respectively). Thus, had Petitioner intended to raise an IAC claim that he was prejudiced at sentencing by counsels' failure to cross-examine Gail during the guilt phase of the trial, he would have raised the claim in both IAC sections of his MAR.

The fact that Petitioner arguably did raise a claim in his Petition for Writ of Certiorari to the North Carolina Supreme Court that he was prejudiced at sentencing by counsels' failure to cross-examine Gail does not cure his failure to raise the same claim before the MAR court. The rule of exhaustion requires that the substance of the claim be fairly presented to *all* appropriate courts. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A defendant cannot satisfy the exhaustion requirement by presenting a claim to the state's highest court in a petition for discretionary review after failing to raise the claim in prior proceedings. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989); *see also Felton v. Barnett*, 912 F.2d 92, 94 (4th Cir.1990) (noting that

certiorari is a form of discretionary review).

Petitioner has failed to exhaust an IAC claim that he was prejudiced at sentencing by counsels' failure to cross-examine Gail at the guilt phase of the trial. However, if Petitioner now filed a second MAR in state court raising this claim, it would be procedurally barred. *See* § 15A-1419(a). Petitioner does not suggest that he was unable to raise this claim previously, so it appears that he could indeed have raised it in his first MAR. Moreover, he offers nothing that would constitute cause and prejudice to excuse his procedural default or that would demonstrate that failure to hear this claim would result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. at 750. Therefore, Petitioner's IAC claim that he was prejudiced at sentencing by counsel's failure to cross-examine Gail at trial about her conversation with Sherry Strickland is procedurally defaulted on federal habeas review.

## CLAIM III: JURY MISCONDUCT

Petitioner claims that members of his sentencing jury read portions of the Bible to two "hold-out" jurors in order to change their votes from life in prison to death. Petitioner claims further that after consulting the Bible, the two "hold-out" jurors changed their votes and recommended a death sentence for Petitioner. Petitioner argues that the Bible is extrinsic evidence when it is not properly introduced into evidence at trial. Petitioner further argues that the jurors read passages of the Bible in order to influence the sentencing verdict of other jurors in violation of his Sixth, Eighth and Fourteenth Amendment rights under the US Constitution.[24]

As the U.S. Supreme Court noted in *Irvin v. Dowd*, among the protections guaranteed by

---

[24]The Court finds this particular contention somewhat ironic considering the extent to which Petitioner's trial counsel relied upon Biblical principles – to include specific passages from the Bible – in order to influence the sentencing verdict. (Tpp 1524-1525; 1530-34)

the Sixth Amendment is the right to an impartial jury that determines its verdict "based upon the evidence developed at trial." 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *see also Turner v. Louisiana*, 379 U.S. 466, 472-73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) ("[T]he evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." (internal quotation marks omitted)). An impartial jury necessarily is one free from extraneous, prejudicial influence, whether it comes from inside or outside the jury room. *See Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) (holding admissible the testimony of jurors describing how they heard and read prejudicial information not admitted into evidence); *Parker v. Gladden*, 385 U.S. 363, 363-65, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966) (finding habeas petitioner was deprived of his right to an impartial jury because of prejudicial remarks made to the jury by a bailiff); *Remmer v. United States*, 347 U.S. 227, 228-230, 74 S.Ct. 450, 450-452, 98 L.Ed. 654 (1954) (allowing juror testimony about a bribe offered to juror); *Stockton v. Virginia*, 852 F.2d 740, 743-46 (4th Cir. 1988) (granting habeas relief where jurors were subject to prejudicial remarks of a non-juror).

To support his claim, Petitioner relies solely upon the affidavits of Maria Van Zant and Marion Hohn, two University of North Carolina Law students volunteering for the Center for Death Penalty Litigation, who interviewed one of the sentencing jurors several years after the trial. (Pet.'s Exhs. 85 & 86) The first affidavit was executed by Ms. Van Zant and describes a conversation Van Zant had with Kenneth Taylor, one of the jurors in Strickland's case. (Pet. Exh. 85) According to the affidavit, Mr. Taylor indicated that during sentencing deliberations a few female jurors initially did not want to vote for a sentence of death; Mr. Taylor indicated that

the jurors were religious people and that there was a Bible in the jury room; Mr. Taylor told Van Zant that some of the jurors in favor of the death penalty took some verses out of the Bible and read them to the hold-out jurors; Mr. Taylor indicated that after the Bible verses were read, the jurors changed their minds and voted for a sentence of death. Also according to the affidavit, Mr. Taylor refused to sign an affidavit setting out what he had told Van Zant in the interview.

Ms. Hohn's affidavit states that she accompanied Van Zant and was present during the interview with Mr. Taylor. (Pet. Exh. 86) Hohn's affidavit, with one or two minor exceptions, is identical to Van Zant's.

The MAR Court dismissed this claim on procedural grounds and conducted a merits review.[25] The court dismissed the claim on procedural grounds "because it is not supported by a proper affidavit or other documentary evidence as required by N.C. Gen. Stat. § 15A-1420(b)(1)."[26] (Pet. Exh. 109, pp. 20-21) The MAR court thus asserted a state procedural rule barring consideration of the claim for failure to comply with the procedural statute.

As noted previously, a claim generally will be procedurally defaulted on habeas review if a state court has expressly found that review in that court is barred by an adequate and

---

[25]In the instant Petition, Strickland asserts that the MAR court decided the claim on the merits. He echoed that argument in his January 9, 2003 Brief on Procedural Default, in which he also argued that the MAR court did not invoke a procedural bar to this claim. However, in his Brief in Response to Respondent's Motion for Summary Judgment, Petitioner argues that the MAR court did not decide the claim on the merits and that this Court is required to review this claim *de novo*.

[26]N.C. Gen. Stat. § 15A-1420(b)(1) states that,
[a] motion for appropriate relief made after entry of judgment must be supported by affidavit or other documentary evidence if based upon the existence or occurrence of facts which are not ascertainable from the records and any transcript of the case or which are not within the knowledge of the judge who hears the motion.

independent state procedural rule. *See Ashe v. Styles*, 39 F.3d at 85. The Fourth Circuit has held that § 15A-1420(b)(1) is an adequate and independent state procedural rule. *See Richmond v. Polk*, 375 F.3d 309, 323-24 (4th Cir. 2004) (citing *Weeks v. Angelone*, 176 F.3d 249, 270 (4th Cir. 1999); *see also State v. Ware*, 125 N.C. App. 695, 482 S.E.2d 14, 16 (1997); *State v. Payne*, 312 N.C. 647, 325 S.E.2d 205, 219 (1985); *State v. Parker*, 61 N.C. App. 94, 300 S.E.2d 451, 453 (1983)). However, it appears that the MAR court's rejection of the two affidavits on procedural grounds may constitute a novel application of § 15A-1420(b)(1). *See Bacon v. Lee*, 225 F.3d 470, 476-77 (4th Cir. 2000) (A statutory procedural rule may not be "adequate" when applied in a novel manner).

While the MAR court acknowledged that Petitioner submitted two affidavits with the MAR, it dismissed the claim on procedural grounds because it was not supported by "proper" affidavit or other documentary evidence as required by § 15A-1420(b)(1). It appears that because the affidavits are made up almost entirely of hearsay and are inadmissible as substantive evidence in a MAR evidentiary hearing, *see State v. Adcock*, 310 S.E.2d 587, 608 (1984), the MAR court concluded that they were not "proper" affidavits under § 15A-1420(b)(1). However, this Court, in an independent review of North Carolina cases, could find no North Carolina appellate court decision holding that an MAR must be supported by "proper" (i.e. admissible) evidence under § 15A-1420(b)(1). *See also, Robinson v. Polk*, 438 F.3d 350, 367 (2006) (Referring to lack of clarity regarding whether North Carolina rules require an MAR be supported by admissible evidence, and noting that "whether inadmissible evidence can be used *at an evidentiary hearing* is a different question from whether inadmissable evidence can support a claim for *entitlement to an evidentiary hearing*." (emphasis in original)); *Conaway v. Polk*, 453 F.3d 567, 584 (2006) (No

47

authority under North Carolina law requiring that affidavits and documents submitted under § 1420(b)(1) constitute admissible evidence). Therefore, it appears that the MAR court may have applied § 15A-1420(b)(1) in a novel manner to procedurally bar this claim.[27]

Despite the apparent novelty of its application of § 15A-1420(b)(1) as a procedural bar, the MAR court relied upon a well-established evidentiary rule to strike the affidavits in its merits review of this claim. Citing *State v. Adcock*, the MAR court struck the two affidavits from consideration because they "are based on inadmissible hearsay." (MAR Order, p. 21) In *Adcock*, the North Carolina Supreme Court upheld an MAR court's ruling barring introduction at an evidentiary hearing of an affidavit as substantive evidence because the affidavit "was clearly hearsay and inadmissible." 310 S.E.2d at 608 . The Supreme Court stated that in an evidentiary hearing for appropriate relief, "adherence to the rudimentary rules of evidence is desirable . . . ." *Id*. Under North Carolina rules of evidence, "[h]earsay is not admissible except as provided by statute or by [the rules of evidence]." NC R. Evid. 802. An evidentiary hearing for appropriate relief is not one of the proceedings exempted by statute from compliance with the rules of evidence. *See* NC R. Evid. 1101(b) (listing proceedings in which the rules of evidence do not apply).

Because the MAR court held an evidentiary hearing to review all of Petitioner's claims, it was required to apply the rules of evidence to its proceedings. This Court is unaware of, and Petitioner has failed to point to, any statute, rule of evidence or exception to the hearsay rule that

---

[27]When asked to address procedural default with regard to this claim, Respondent merely asserted that the failure to raise the defense of procedural default with regard to this claim was "inadvertent" and argued that Petitioner had failed to show cause and prejudice or that a fundamental miscarriage of justice would result to excuse default of this claim. (January 13, 2003 Brief on Proc. Dflt.)

required the MAR court to consider affidavits based solely on hearsay as substantive evidence.[28]

Petitioner did not call any witnesses or introduce any evidence at the MAR hearing to support this claim. Instead, he relied upon the pleadings. Having no substantive evidence before it to support the claim, the MAR Court dismissed it. (MAR Order, p. 21, "The Court notes that no testimony on this claim was offered at the evidentiary hearing. As a result, this claim is dismissed.")

In federal habeas actions, the court does not sit "to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000) (citations omitted) (refusing to consider on habeas review two affidavits struck by the State post-conviction court on evidentiary grounds). As demonstrated above, the MAR court's evidentiary ruling was not erroneous under North Carolina law.

Even if the MAR court's evidentiary ruling was erroneous, the ruling was not so extreme as to result in the denial of a constitutionally fair proceeding. On the contrary, the MAR court

---

[28]In the PWHC, Petitioner offers one legal citation to support his argument that the MAR court should have considered the affidavits as substantive evidence despite their reliance on hearsay. According to Petitioner, "[a]ffidavits relying on hearsay can and should be considered by the court and should not be 'deemed insufficient [for their reliance on hearsay], so long as a substantial basis for crediting the hearsay is presented.'" (PWHC, ¶ 394 (quoting *State v. Jackson*, 309 NC 26, 37-38, 305 S.E.2d 703-712 (1983).) Petitioner has taken this quote from *Jackson* out of context. The issue in *Jackson* was whether a magistrate erred in issuing a search warrant based on the law enforcement officer's affidavit, which contained hearsay statements of an informant. Not only is this case not on point, the Court notes that had the State in *Jackson* attempted to introduce the officer's affidavit as substantive evidence at trial, it would have been inadmissible. *See State v. Edwards*, 337 S.E.2d 508, 509 (NC 1985) ("It is error to allow a search warrant together with the affidavit to obtain search warrant to be introduced into evidence because the statements and allegations contained in the affidavit are hearsay statements . . . .") (citations omitted).

49

held an evidentiary hearing during which Petitioner presented evidence on a number of claims. Petitioner did not offer any evidence on this issue during the hearing. Although he called witnesses to testify on various other issues, he did not call Mr. Taylor or any other jurors to testify as to the allegations in this claim. Instead, Petitioner chose to rely on the pleadings, which consisted only of the two unsubstantiated hearsay affidavits. Both affidavits were executed in February, 1999. The MAR evidentiary hearing was held in May, 2001. Petitioner had more than two years in which to gather evidence to substantiate this claim but failed to do so.

Because the MAR court's decision to strike the affidavits on evidentiary grounds was not erroneous, and because the ruling did not result in the denial of a constitutionally fair proceeding, this Court may not consider these affidavits in its review of Strickland's claim.[29] *See Burket*, 208 F.3d at 186. This Court has no evidence before it that substantiates or supports Strickland's claim that jurors consulted the Bible during sentencing deliberations.[30] There being no factual basis to support this claim, it is dismissed.

---

[29]Petitioner argues that pursuant to *Jones v. Cooper*, 311 F.3d 306 (4th Cir. 2002), this Court must consider the affidavits regardless of the fact that the State court struck them pursuant to state evidentiary law. In *Jones*, the Fourth Circuit reviewed an affidavit containing a juror's hearsay statements, even though the North Carolina court had quashed the affidavit and dismissed the MAR. However, in the *Jones* case, it appears that the state court quashed the affidavit and dismissed the MAR without holding a hearing. *Id.* at 309. In the instant matter, the MAR court specifically relied upon a North Carolina Supreme Court case, *State v. Adcock*, 310 S.E.2d 587 (NC 1984), to strike the affidavits on hearsay grounds after holding a hearing on Petitioner's claims. As this Court has noted, *Burket v. Angelone*, is the governing authority for disposition of this matter. 208 F.3d at 186.

[30]Nor does this Court see a statutory basis for holding a hearing in federal court on this matter. As previously noted, Petitioner had a full and fair hearing in the State post-conviction court, and he chose not to present any substantive evidence to substantiate this claim. *See* § 2254(e)(2) (no evidentiary hearing permitted if petitioner failed to develop the factual basis of a claim in State court proceedings); *see also Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

**CLAIM IV: INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING**

During the sentencing phase of his trial, the state presented one aggravating factor to the jury – that the defendant had been previously convicted of a felony involving the use or threat of violence to the person. *See* § 15A-2000(e)(3).  Defense counsel called three witnesses to testify at sentencing – Dr. Mark Worthen, Officer James Clemmons and Grant Davis.  The trial court instructed the jury on two non-statutory mitigating circumstances – that "the defendant is the father of three children" and that "the defendant has great personal pride and belief in the values of his Native American Heritage"– and one statutory mitigating circumstance – the catch-all "any other circumstance arising from the evidence which the jury deems to have mitigating value," N.C.Gen. Stat. § 15A-2000(f)(9).  The jury deliberated for less than two hours and did not find the existence of any mitigating circumstances.

Petitioner has pointed to a number of alleged failings on the part of counsel.  The Court has separated and rearranged these claims into three sub-sections.  The first deals with procedurally defaulted claims.  The second covers Petitioner's claim that counsel were ineffective for failing to present evidence to mitigate the State's aggravating factor.  The third covers Petitioner's claims that counsel were ineffective for failing to present readily available mental health and substance abuse mitigating evidence to the jury.

**A.  Procedurally Defaulted Claims**

### *Failure to Tender Dr. Worthen as an Expert*[31]

Petitioner claims that trial counsel were ineffective for failing to tender defense mental

---

[31]Presented as Claim IV A(2) in the PWHC.  The Court ordered the parties to address the issue of procedural default with regard to this claim in its December 13, 2002 Order.

health expert, Dr. Mark Worthen, as an expert in psychology during his testimony at the sentencing hearing. Petitioner raised this claim as Claim V 3 (a) of his MAR. The MAR court found that it was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) because Petitioner could have raised this claim on direct appeal but did not.[32]

Section 15A-1419(a)(3) generally bars collateral review in the State courts of claims that could have been brought on direct appeal but were not. The Fourth Circuit has recognized that § 15A-1419(a)(3) generally is an independent and adequate state procedural bar. *McCarver v. Lee*, 221 F.3d at 589. However, the fact that § 15A-1419(a)(3) is generally an adequate and independent state procedural bar does not end the reviewing court's inquiry. *See Brown v. Lee*, 319 F.3d 162, 170 (4th Cir. 2003) (citing *Bacon v. Lee*, 225 F.3d 470, 476-77 (4th Cir. 2000), *cert. denied* 532 U.S. 950, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001); *McCarver*, 221 F.3d at 589). Where § 15A-1419(a)(3) has not been consistently and regularly applied by the state court to a particular type of federal constitutional claim, it cannot be considered an adequate state law ground barring federal court review of the merits of that claim. *See Brown*, 319 at 170. Therefore, the reviewing court must determine whether § 15A-1419(a)(3) is regularly and

_____

[32]In the portion of the Order addressing this claim, the MAR court found that this claim was barred by N.C. Gen. Stat. § 15A-1419(b)(1) and (e). However, it is clear that the MAR court intended to cite N.C. Gen. Stat. § 15A-1419(a)(3) as a procedural bar in addition to the other two statutory sections. This is made clear by the section of the MAR Order, entitled "Failure to Question Dr. Worthen," which states,

> 4. Defendant claims that trial counsel did not ask Dr. Worthen questions to allow testimony relating to defendant's mental health and substance abuse. *As found above*, this argument could have been made on direct appeal; and therefore, is barred under N.C.G.S. § 15A-1419(a)(3) and N.C.G.S. § 15A-1419(b)(1) and (e).

(MAR Order p. 10) (emphasis added). The section "above" that the MAR court was referring to is the section of the MAR Order addressing defendant's claim that trial counsel failed to tender Dr. Worthen as an expert. (MAR Order 9-10) Thus, the MAR court's failure to cite § 15A-1419(a)(3) with regard to the previous claim appears to have been inadvertent.

consistently applied to claims of the type raised by the petitioner. *Reid v. True*, 349 F.3d 788, 805 (4th Cir. 2003). The relevant inquiry concerns the procedural posture of the defaulted claim: "The question we must ask ... is whether the particular procedural bar is applied consistently to cases that are procedurally analogous--here, cases in which the particular claim raised could have been raised previously but was not." *See id.* (quoting *McCarver*, 221 F.3d at 589).

In his brief addressing the issue of procedural default, Petitioner argues that § 15A-1419(a)(3) is not regularly and consistently applied to IAC claims. (Jan. 9, 2003 Brief on Proc. Dflt.) However, the Fourth Circuit has recognized that North Carolina courts have applied § 15A-1419(a)(3) to bar IAC claims that could have been brought on direct review but were not. *See McCarver*, 221 F.3d at 589 ("[W]e reject McCarver's attempt to treat ineffective assistance claims as categorically different from other kinds of claims that can be barred under section 15A-1419(a)(3)). In order to demonstrate that § 15A-1419(a)(3) is not consistently and regularly applied to IAC claims, Petitioner would need to cite a "non-negligible number of cases" in which an IAC claim could have been brought on direct review but was not, and in which the collateral review court nonetheless failed to bar the claim under § 15A-1419(a)(3) because it was an IAC claim. *See Reid v. True*, 349 F.3d at 805 (quoting *McCarver*, 221 F.3d at 589).

Petitioner has failed to cite any cases that meet the above criteria. Instead, he cites seven (7) cases in which defendants brought IAC claims on direct appeal, and the North Carolina Courts found that an MAR proceeding was a more appropriate avenue for asserting those claims because the claims could not be determined solely from the record on appeal.[33] (Pet.'s Jan. 9,

---

[33]The cases cited by Petitioner are: *State v. Ware*, 482 S.E.2d 14, 16 (NC App. 1997) ("[W]e *cannot determine from the record on appeal* that these statements by defense counsel [conceding defendant's guilt] were made without defendant's consent.") (emphasis added); *State*

2003 Brief on Proc. Dflt., pp. 24-25)  Not only has Petitioner failed to cite any cases in which an IAC claim could have been brought on direct review but was not, "*and in which the collateral review court nonetheless failed to bar the claim under § 15A-1419(a)(3) because the claim was an ineffective assistance of counsel claim*," *McCarver*, 221 F.3d at 589, the cases he has cited clearly show that the North Carolina courts distinguish between IAC claims that can be determined from the record on appeal and those that cannot.  Thus, the cases he has cited lend no support to an argument that a defendant is not required to raise on direct appeal those IAC claims that are apparent from the record. For the foregoing reasons, Petitioner's argument that § 15A-1419(a)(3) is not an adequate and independent state procedural bar to this claim is without merit.

The trial record was more than sufficient to enable Petitioner's appellate counsel to advance this IAC claim on direct appeal.  Indeed, during the MAR proceedings, the only

---

*v. House*, 456 S.E.2d 292, 297 (NC 1995) ("The *record on appeal* before this Court *is silent* as to whether defendant did or did not consent to his attorney's concession of guilt.") (emphasis added); *State v. Baynes*, 456 S.E.2d 298, 299 (NC 1995) (same); *State v. Harris*, 449 S.E.2d 371, 377 (NC 1994) (Defendant conceded that "there is *no evidence in the record* which would support . . . a finding [of ineffective assistance of counsel] . . . .") (emphasis added); *State v. Jordan*, 365 S.E.2d 617, 620 (NC 1988) ("[D]efendant's ineffective assistance of counsel claims *are not developed on the record* and are more properly addressed by a Motion for Appropriate Relief.") (emphasis added); *State v. Dockery*, 336 S.E.2d 719, 721 (NC 1985) ("Because of the *lack of any evidence available to us* concerning the validity of defendant's alibi defense, we cannot say that defendant suffered any prejudice as a result of his attorney's failure to present it effectively to the jury. . . .") (emphasis added); *State v. Wise*, 306 S.E.2d 569, 571 (NC 1983) ("[An attorney's alleged conflict of interest] . . . unlike the use of certain trial tactics or the actual performance of an attorney at trial, is *not a matter which will appear on the face of the record*. . . . .:) (emphasis added).

Petitioner also cites *State v. Kinch*, 331 S.E.2d 665, 669 (NC 1985).  In that decision, the North Carolina court gives no indication what the IAC claim was or why it could not address the claim.  Therefore, there is insufficient information for this Court to determine whether this case supports Petitioner's argument.

evidence Petitioner offered to support this claim was from the trial transcript.[34]  Petitioner has failed to show cause and prejudice or that a fundamental miscarriage of justice would occur to excuse the procedural default.  *See Coleman v. Thompson*, 501 U.S. at 750.  Therefore, this claim is procedurally defaulted in this Court.

### *Failure to Present Testimony of Doris Perkins Lee during Sentencing*[35]

As noted previously, during Petitioner's sentencing trial, the prosecution presented one aggravating factor for the jury's consideration – that the defendant had been previously convicted of a felony involving the use or threat of violence to the person. *See* § 15A-2000(e)(3).  To support this aggravating factor, the prosecution presented evidence that Petitioner had been convicted of voluntary manslaughter for shooting Derrick Skipper in Richmond County in 1993 and assault with a deadly weapon inflicting serious injury for stabbing Todd Kendall in 1994.  Petitioner claims that trial counsel were ineffective for failing to present the testimony of Doris Perkins Lee, who testified during the voluntary manslaughter trial that Petitioner drew his gun and shot at Skipper only after Skipper shot at and wounded Petitioner in the leg.  Petitioner complains that the MAR court failed to address his IAC claim regarding Doris Perkins Lee and that this Court, therefore, is required to conduct a *de novo* review of the claim.[36]

---

[34]In his January 9, 2003 Brief on Procedural Default, Petitioner states that to prove this claim in state proceedings he relied upon his MAR and did not present further evidence on the issue at the MAR hearing. (p. 17)  In his MAR, Petitioner cites only the trial transcript to prove this claim. (Pet. Exh. B, ¶¶ 214(a), 133-34)

[35]Presented as Claim IV B(1) in the PWHC.  In its Dec. 13, 2002 Order, the Court ordered the parties to address the issue of procedural default with regard to this claim.

[36]Respondent's treatment of this claim is indicative of a general lack of attention to the actual allegations and arguments raised in the instant Petition.  Throughout the Answer and Brief in Support of the Motion for Summary Judgment, Respondent treats Petitioner's claims as if they

The fact that the MAR court did not address an IAC claim regarding Doris Perkins Lee is not surprising considering that her name does not appear anywhere in Petitioner's IAC claim. (MAR Claim V A(3), pp. 59-64) In his MAR, Petitioner claims that counsel were ineffective because they,

> 214 (f) Failed to elicit any testimony from Officer Clemmons, or provide testimony from any other witness to show that Defendant was shot in the leg and had a gun drawn on him first as set forth specifically above in the altercation which resulted in Defendants' 1993 conviction for voluntary manslaughter in Richmond County. (See Paragraphs 145-147 supra; Exhibits "71" and "72").

"Fair presentation" of a claim to a state court "mandates that the federal claim 'be presented face-up and squarely.... Oblique references which hint that a theory may be lurking in the woodwork will not suffice.'" *Baker v. Corcoran*, 220 F.3d 276, 289 (quoting *Matthews v. Evatt*, 105 F.3d at 911 (internal quotation marks omitted)). Rather, "both the operative facts and the controlling legal principles must be presented to the state court." *Id.*

_____

are identical to those raised in State Court. For example, although Petitioner devotes this entire claim to counsel's failure to produce Doris Perkins Lee and her voluntary manslaughter testimony, Respondent does not make any reference to Doris Perkins Lee when addressing this claim. Additionally, Respondent referred to this claim under the heading: "Failure to Elicit from Officer Clemmons or Another Witness Testimony That Defendant Was Shot in the Leg and Had a Gun Drawn on Him in the 1993 Incident Which Resulted in Defendant's Voluntary Manslaughter Conviction." However, the claim in the instant Petition dealt solely with Doris Perkins Lee and was entitled "Testimony of Doris Perkins Lee: Victim Shot Petitioner First." Unlike in his MAR, Petitioner does not raise a claim with regard to Officer Clemmons in this section of his Petition.

Furthermore, when specifically ordered by this Court to address the issue of procedural default with regard to this claim, Respondent asserted that the MAR court had found that counsel's failure to present the testimony of Doris Perkins Lee was without merit and then cited the MAR court's analysis of Strickland's *newly discovered evidence claim*. (Resp.Jan. 13, 2003 Brief on Proc. Dflt. p. 3) In fact, the MAR court did not address an IAC claim regarding Doris Perkins Lee; rather, it addressed Petitioner's IAC claim regarding Officer Clemmons, and it found that claim to be procedurally barred because Petitioner had raised it on direct appeal. (MAR Order, pp. 13-14)

In this case, the "operative facts" of the claim were not presented "face-up and squarely." Doris Perkins Lee was not mentioned in the claim. Additionally, paragraphs 145-147 appear in the procedural and factual history section of the MAR, not in the section of the MAR where Petitioner asserted his IAC at sentencing claims. (MAR, Sect. III D, pp. 40-41) Paragraph 145 refers to Officer Clemmons; paragraph 146 refers to "any witnesses in the tavern on the night in question . . . ." Paragraph 147 refers to Doris Perkins Lee.[37] Thus, in order for the MAR court to have addressed an IAC claim regarding Doris Perkins Lee, it would have had to recognize that Petitioner's reference in paragraph 214(f) to "any other witness" was an allusion to Doris Perkins Lee, and Doris Perkins Lee only. The MAR court did not make any such connection; it only addressed Petitioner's IAC claim regarding Officer Clemmons, the only person actually named in the claim. (MAR Order, pp. 13-14)

Furthermore, in order to "fairly present" a claim in state court, a petitioner "must explain how these alleged events establish a violation of his constitutional rights." *Mallory v. Smith*, 27 F.3d 991, 994 (4th Cir. 1994) (citations omitted). In his presentation of his IAC claim before the MAR court, Petitioner makes the conclusory statements that counsel's failure to present evidence that Strickland was shot in the leg and had a gun drawn on him first in the Richmond County shooting constituted ineffective assistance of counsel and that he was prejudiced thereby. However, he fails to explain how or why counsel were ineffective for failing to elicit this evidence from Officer Clemmons or "any other witness." (MAR, Claim V A(3), pp. 59-64) He

---

[37]Paragraph 147 states that Doris Perkins Lee testified at the voluntary manslaughter trial that the victim in that case, Derrick Skipper, drew his gun first and attempted to shoot Petitioner in the chest but ultimately shot him in the leg. Exhibit 72, referenced above, is a portion of Doris Perkins Lee's direct testimony at the voluntary manslaughter trial. Exhibit 71 is Officer Clemmons testimony at Petitioner's sentencing hearing.

certainly does not state how or why Perkins Lee's testimony at the voluntary manslaughter trial was in any way relevant to his sentencing in this case, or how counsel's failure to present it rose to the level of a constitutional violation. In short, he failed to give any sort of legal argument to support his conclusory statement that counsel were ineffective for failing to present evidence from "any other witness" that Petitioner was shot in the leg and had a gun drawn on him first. As a result, the MAR court was not alerted to the fact that Petitioner was raising an IAC claim with regard to Doris Perkins Lee's testimony in the prior case.[38]

For the foregoing reasons, the Court concludes that Petitioner failed to "fairly present" an IAC claim with regard to Doris Perkins Lee's testimony to the MAR court. Therefore, this claim was not exhausted in the State courts and would be procedurally barred if Petitioner attempted to raise it now. *See* § 15A-1419(a). Petitioner has failed to show cause and prejudice or that a fundamental miscarriage of justice would occur to excuse the procedural default. *See Coleman v. Thompson*, 501 U.S. at 750. Therefore, the claim is procedurally defaulted on habeas review.

**B: Ineffective Investigation and Presentation of Mitigating Evidence Related to the Prosecution's Aggravating Factor**

*Failure to Present Richmond County Hospital Records at Sentencing*[39]

Petitioner also claims counsel were ineffective for failing to present evidence from his Richmond County medical records that he was shot during the 1993 altercation with Derrick

---

[38]While it is true that at the MAR hearing, post-conviction counsel questioned Harry Crow about whether he was aware prior to trial of Doris Perkins Lee's testimony from the Richmond County trial, such questioning would not have put the MAR court on notice that Petitioner was raising an IAC claim regarding Ms. Lee. In his MAR, Petitioner raised a newly discovered evidence claim with regard to Ms. Lee.

[39]Presented as Claim IV B(2) in the PWHC.

Skipper. Had counsel presented this evidence, Petitioner argues, the jury would have realized that he was acting in self-defense and would not have sentenced him to death.

The MAR court found Petitioner's claim that trial counsel was ineffective for failing to present medical records from Richmond Memorial Hospital to the jury to be without merit. As its reasoning, the MAR stated that Petitioner had refused to allow trial counsel access to his medical records and instructed trial counsel not to offer mitigating evidence. The MAR court did not reach the prejudice prong of *Strickland*.

This Court finds that the MAR court's conclusion is based upon an unreasonable determination of the facts in light of the evidence. *See* § 2254(d)(2). Evidence presented at the MAR hearing showed that Petitioner did not refuse to allow trial counsel access to his medical records. (Pet. Exhibits 94-97; MAR Tpp 55-56; 78) In fact, he signed several blank medical release forms so that his counsel could obtain his medical records. (Pet. Exhibits 96 & 97) While it is true that Petitioner refused to allow counsel to put on what is commonly considered a "mitigation defense" (i.e. evidence put forward to mitigate a defendant's culpability for the crime at issue), there is no evidence that he was opposed to offering evidence to mitigate the state's aggravating factor. (MAR Tp 94) In fact, trial counsel presented testimony from Officer James Clemmons and Grant Davis for that very purpose. Nevertheless, Petitioner's claim is meritless.

Contrary to Petitioner's assertions, the Richmond Memorial Hospital records do not indicate that he was shot while trying to defend himself during a shooting. The records merely state that on June 6, 1993, Petitioner appeared in the emergency room at Richmond Memorial Hospital with a gunshot wound to the right thigh. (Pet. Exh. 73) There are no details provided in the records about how he received that wound. More importantly, there is nothing in the records

to indicate that Petitioner was involved in a shootout during which he was shot first and only returned fire to protect himself.[40]

Evidence that Petitioner was treated for a gunshot wound on the same day that he killed Derrick Skipper does not "tend[ ] logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *McCoy v. North Carolina*, 494 U.S. 433, 440, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (internal quotation marks omitted). Therefore, these records have no mitigating value, and counsel were not deficient for failing to present them. *See Strickland*, 466 U.S. at 687.

### C: Insufficient Investigation and Presentation of Mitigating Factors[41]

> ***Failure to Question Mental Health Expert on Relevant Mitigating Circumstances Regarding Petitioner's Mental Health***
> ***Failure to Obtain and Present Hamlet Hospital/Sandhills Mental Health Records and Opinion Testimony Thereon***
> ***Failure to Inform Dr. Worthen of Relevant Testimony from Gail Brown and Sherry Jenkins***
> ***Failure to Supply Necessary Mental Health and Intoxication Evidence to Dr. Worthen***

Petitioner's trial counsel retained one mental health expert, Dr. Mark Worthen, a clinical and forensic psychologist, to assist them in preparing Petitioner's mitigation defense. Dr. Worthen was retained approximately one month before the start of Petitioner's trial, and to assist him, trial counsel provided him with Petitioner's mental health records from Dorothea Dix Hospital (hereinafter "Dorothea Dix" or "Dix"), a forensic psychiatric hospital, and from the

---

[40]The Court notes that the records do indicate that Petitioner smelled strongly of alcohol when he appeared in the emergency room to be treated for the gunshot wound and that he had seven previous gunshot wounds. In fact, Petitioner's discharge sheet carries an admonition that he not "get shot anymore."

[41]Presented as Claims IV A(1) & (3)-(5) in the PWHC.

North Carolina Alcohol and Drug Abuse Center in Butner, North Carolina (hereinafter "Butner"). (Pet. Exhs. 104 & 105)  In addition, Dr. Worthen had a brief evaluation session with Petitioner, consisting of questions regarding his family history and his mental status at the time of the offense. (State's Exh. D; State's MAR Exhibit 6, p. 1, ¶ 1)  However, Dr. Worthen was unable to conduct further interviews or psychological testing because Petitioner refused to continue with the evaluation. (State's Exh. D; State's MAR Exhibit 6, p. 1, ¶ 1)

Dr. Worthen testified only during the sentencing phase of the trial.  Dr. Worthen told the jury about the amount of alcohol that Petitioner had reported consuming on the night of the shooting, and about Petitioner's pride in his Native American heritage.  However, counsel did not elicit any testimony from Dr. Worthen regarding Petitioner's medical and mental health history. (Tpp 1474-77)

Petitioner asserts that had counsel laid a proper foundation for Dr. Worthen's testimony regarding medical and mental health issues or made an offer of proof as to the contents of the testimony he was attempting to elicit from Dr. Worthen, or introduced into evidence Petitioner's medical records from Dorothea Dix and Butner, the trial court would have been required to submit to the jury the statutory mitigating circumstance that the murder was committed while the Defendant was under the influence of a mental or emotional disturbance. *See* N.C. Gen. Stat. § 15A-2000(f)(2).  Furthermore, post-conviction counsel provided Dr. Worthen with Petitioner's medical records from Hamlet Hospital/Sandhills Mental Health Clinic (Pet.'s Exh. 106), Petitioner's education records (Pet.'s Exh. 107) and trial testimony of Gail Brown and Sherry Strickland regarding alcohol and drug use on the night of the murder.  Petitioner asserts that had this information been provided to Dr. Worthen prior to sentencing, Dr. Worthen's subsequent

testimony would have required submission of the statutory mitigating circumstances that the murder was committed while the Defendant was under the influence of a mental or emotional disturbance, *see id*., and that the Defendant's ability to appreciate the criminality of his conduct was impaired at the time of the murder, *see* § 15A-2000(f)(6).

The MAR court rejected these claims on the merits.[42]  The court concluded that counsel were not deficient because Petitioner did not want to put on a mitigation defense and refused to allow Dr. Worthen to fully evaluate him.  The court also found that Petitioner refused to allow full access to his medical records and medical history.  With one exception, the MAR court did not address the prejudice prong of *Strickland*.

The MAR court's finding of fact that Petitioner refused to allow trial counsel full access to his medical records is clearly erroneous.  *See* § 2254(e)(1).  The record, as it was established at the MAR hearing, shows that Petitioner granted his trial counsel full access to his medical records.  He signed medical release forms for the specific purpose of obtaining his mental health records from Dorothea Dix and Butner. (Pet. Exhibits 94 & 95)  He also signed two blank, general release forms so that his trial attorneys could obtain medical records from other medical facilities.[43] (Pet. Exhibits 96 & 97)  The records from Hamlet/Sandhills could have been

---

[42]The MAR court also held that some of these claims were procedurally barred because Petitioner could have raised them on direct appeal but failed to do so. *See* § 15A-1419(a)(3). However, Respondent did not raise procedural default as a defense, and the Court declines to raise it *sua sponte* with regard to these claims.

[43]Respondent repeatedly asserts that the reason trial counsel were unable to obtain Petitioner's medical records was because Petitioner refused to sign medical releases for his records. (Resp. Brief, pp. 24, 27, 31) In so doing, Respondent relies solely on Harry Crow's post-conviction affidavit. (State Exh. 6)  Had Respondent bothered to glance through the MAR hearing transcript, he would have discovered that Crow's testimony during the MAR hearing impeached his own affidavit.  Crow testified that before Strickland met with Dr. Worthen, he

discovered easily by counsel because Petitioner's Dorothea Dix records refer to Petitioner's admittance to Hamlet and his referral to Sandhills. (Pet. Exhibit 104, 1994 Discharge Summary).

Additionally, the MAR court based its conclusion that counsel were not deficient on an incomplete analysis of the facts. The MAR court's conclusion was based solely on the actions of Petitioner. The court did not actually assess *counsels*' actions. "Simply because a defendant objects to the development of evidence, . . . does not necessarily absolve his lawyers from gathering that evidence." *Frye v. Lee*, 235 F.3d 897, 904 (4th Cir. 2000).

In this case, Strickland refused to cooperate with development of a mitigation defense from the beginning. Attorney Goodwin testified at the MAR hearing that Petitioner told counsel not to talk to his family and that he would not allow them to testify at trial. (MAR Tp 93) Goodwin also testified that Petitioner did not want counsel to present his family or social background for the purposes of mitigation. (MAR Tp 94) However, counsel did not completely give up hopes of a mitigation defense in the face of Strickland's refusal to involve his family, usually a source of potentially mitigating evidence. They convinced him to submit to an evaluation by Dr. Worthen, although they had to "beg" him to do so. (MAR Tp 78) Additionally, they convinced him to sign some release forms to obtain mental health records that Dr. Worthen had requested.[44] (Pet. Exhs. 94-97) These were logical and reasonable steps for counsel to take,

---

signed some medical release forms so that counsel could get the records that Dr. Worthen needed. (MAR Tp 78) At the MAR hearing, Petitioner introduced four medical release forms that he had signed on Sept. 20, 1995. (Pet. Exhs. 94-97; MAR Tpp 55-56) Attached to two of the signed medical release forms were letters from Crow to the administrators at Dorothea Dix and Butner requesting Petitioner's medical records from those institutions. (Pet. Exhs. 94 & 95; MAR Tpp 55-56)

[44]It is important to note that these releases were signed prior to Strickland's meeting with Dr, Worthen, and, consequently, prior to his final decision to inhibit and prohibit a meaningful

especially in light of Petitioner's refusal to allow access to his family.

Strickland, however, quickly cut off this avenue, as well. Dr. Worthen testified at sentencing that he met with Strickland one time and that after talking about his heritage and how much he had to drink on the night of the shooting, Strickland told Dr. Worthen that he did not want to continue with the evaluation. (Tpp 474-75) In fact, his discussion with Strickland was so brief that Dr. Worthen was unwilling to characterize it as an evaluation. (Tp 1477)

At the MAR hearing, attorney Goodwin testified that in addition to refusing to be evaluated, Strickland restricted the mitigating evidence counsel could get in through Dr. Worthen. (MAR Tpp 89; 94) Dr. Worthen wrote in a pre-trial letter to counsel, dated October 22, 1995, that he had reviewed Petitioner's records from Dorothea Dix and Butner and that those records indicate that Petitioner has a history of alcohol and drug abuse and a history of becoming violent when drinking. (State's PWHC Exhibit D; State's MAR Exhibit 6) Additionally, Dr. Worthen wrote that the records indicate that Petitioner reported a history of a rough childhood, fighting, legal trouble, early onset of drinking (age 10), suicidal threats and diagnoses of alcohol dependence and antisocial personality disorder. However, Goodwin testified that Petitioner had restricted counsel's ability to elicit most of this evidence through Dr. Worthen. Specifically, Petitioner prohibited introduction of evidence regarding his family, his social and developmental history, and any mental health history that might indicate that Petitioner was mentally ill. (MAR Tpp 89-90; 94) Goodwin testified that he and attorney Crow had other mitigating evidence available, but they did not introduce it because Petitioner did not want it introduced. (MAR Tp 90) Additionally, Goodwin testified that he went over with Petitioner the pros and cons of not

mitigation defense. (MAR Tp 78)

offering the mitigating evidence that they had and let Petitioner make the decision on how to proceed. (MAR Tpp 89; 93)

Having flatly refused to allow counsel to speak to his family about possible mitigating evidence and having stymied counsel's attempts to present mitigating evidence through Dr. Worthen, Petitioner now complains that counsel were ineffective for failing to conduct an adequate mitigation investigation and for failing to introduce the mitigating evidence that they had. However, this is not a situation in which counsel "completely gave up in response to reluctance or defeatism that ambiguously telegraphed the client's uninformed wishes." *Frye v. Lee*, 235 F.3d at 905. Strickland consciously and against counsel's advice closed off one avenue of potential mitigation, and when counsel attempted another route, Strickland threw up road blocks to that, as well. In light of Strickland's continued recalcitrance, his refusal to cooperate with Dr. Worthen and the restrictions he placed on evidence that could be presented through Dr. Worthen, it was not unreasonable for counsel not to continue their mitigation investigation. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.... In particular, what investigation decisions are reasonable depends critically on such information"); *see also*, *Frye v. Lee*, 235 F.3d at 904-05; *United States v. Wellington*, 417 F.3d 284, 288-89 (2nd Cir. 2005); *Wallace v. Davis*, 362, F.3d 914, 919-20 (7th Cir. 2004).

Furthermore, had Goodwin attempted to introduce the "mitigating evidence that they had," he would have violated the restrictions set by his client. *See Wallace*, 362 F.3d at 920 (Had counsel presented evidence against defendant's instructions, there would have been a solid ineffective assistance argument, but by respecting defendant's wishes, counsel abided by ethical

requirements as defendant's agent); *see also*, *Lovitt v. True*, 403 F.3d 171, 179 (4th Cir. 2005) (Because "capital sentencing proceedings do not set at naught the basic principle of attorney-client relations: namely that counsel . . . remain in the end the agents of the one most intimately affected," counsel were not ineffective for incorporating their client's wishes into their professional judgment). As it was, counsel did elicit testimony through Dr. Worthen about Petitioner's interest and pride in his Native American heritage, a subject that apparently was not off-limits.[45] Counsel also attempted –unsuccessfully– to turn Petitioner's refusal to mount a mitigation defense into a form of mitigation by requesting the court to submit to the jury the non-statutory mitigating circumstance that "defendant feels that he owes it to his children and his people to refuse any kind of mitigating defense and instead to be a good strong Indian." *See State v. Strickland*, 488 S.E.2d at 207.

Petitioner counters that counsel intended to elicit evidence from Dr. Worthen about the mental and developmental history contained in the Dorothea Dix and Butner records and that counsel's failure to do so was because he did not lay the proper foundation for its admission, not because of any decision by Petitioner. While the Court is inclined to agree that counsel's examination of Dr. Worthen was inept,[46] the record does not indicate that Goodwin intended to

---

[45]In fact, Dr. Worthen testified that when trial counsel told him they would ask him questions regarding the information in his October 22, 1995 letter, counsel seemed most interested in what Strickland had told Worthen about his Native American heritage. (MAR Tp 129)

[46]Attorney Goodwin conducted the direct examination of Dr. Worthen at sentencing. Counsel asked Dr. Worthen if he had used the Butner and Dorothea Dix records when he evaluated Strickland. Dr. Worthen responded that he had not. Counsel then attempted to ask Dr. Worthen about information in the Butner records. The court sustained the State's objection on foundation grounds. Counsel for Petitioner abruptly ended his examination of Dr. Worthen without eliciting any evidence from the Butner records. (Tpp 1474-77)

violate Petitioner's restrictions by questioning Dr. Worthen about Strickland's developmental and mental health history. (MAR Tp 89)  Dr. Worthen had indicated in his October 22, 1995 letter that he could testify about Petitioner's history of substance abuse, which arguably falls outside Petitioner's mitigating evidence restrictions.[47]  There is nothing in the record to suggest that Goodwin was attempting to elicit anything other than that when he began to question Dr. Worthen about the Butner records, which, the Court notes, cover Petitioner's voluntary commitment for substance abuse treatment in 1994.  For the foregoing reasons, the MAR court's conclusion that counsel were not deficient in their preparation and presentation of a mitigating defense was not "objectively unreasonable." *See* § 2254(d)(1).

Furthermore, even if counsel's conduct could be considered deficient, Petitioner has failed to show that but for counsels' ineffectiveness, he would have been entitled to jury instructions on the (f)(2) or (f)(6) mitigating circumstances.  More importantly, he has failed to show that the mitigating evidence contained in his mental health records outweighs the aggravating evidence in this case. *See Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542 (2003).  He, therefore, is unable to show that he was prejudiced under *Strickland*.  *See id*.

Under North Carolina law, a trial court must submit only those statutory mitigating circumstances that are supported by substantial evidence.  *See State v. Chandler*, 467 S.E.2d 636, 644, *cert. denied*, 519 U.S. 875, 117 S.Ct. 196 (1996).  In considering when the (f)(2) mitigating circumstance may be submitted, the North Carolina Supreme Court has stated that "the central question is a defendant's mental and emotional state *at the time of the crime*." *State v. Gainey*,

---

[47]Dr. Worthen already had testified about Petitioner's self-reported alcohol consumption on the night of the murder.

558 S.E.2d 463, 482 (NC 2002) (citations omitted) (emphasis added). At the MAR hearing, Dr.

Worthen testified that based on the medical records he had before trial and the medical records

he received from post-conviction counsel, it was his professional opinion "to a reasonable degree

of professional certainty, [that] a person with [Petitioner's] background, developmental and

mental health history, would - there's a good likelihood that he would have been under the

influence of a mental or emotional disorder at the time of the crime to some extent." (MAR Tpp

138-39). The Court does not find this testimony credible.[48]

In his October 22, 1995 letter to trial counsel, Dr. Worthen stated that the Dorothea Dix

and Butner records indicate that Petitioner has a history of alcohol and drug abuse and a history

of becoming violent when drinking. (State's PWHC Exhibit D; State's MAR Exhibit 6)

However, Dr. Worthen also informed trial counsel that,

> *Because Mr. Strickland did not permit me to conduct a thorough evaluation I*
> *would not be able to state with a reasonable degree of professional certainty*
> whether or not he suffers from any of the above disorders or others . . . ; *to what*
> *extent he may meet the statutory mitigating circumstances in capital sentencing*
> *cases*; or any pertinent information about his development or life circumstances,
> other than what has been listed in this letter.

(State's PWHC Exhibit D; State's MAR Exhibit 6) (emphasis added) It is clear from Dr.

Worthen's letter that his inability to render an opinion regarding whether Strickland met any

statutory mitigating circumstances was not because he lacked sufficient records or

documentation; it was because Strickland refused to allow him to conduct a full psychological

evaluation. (MAR Tpp 145-46) There was no evidence presented at the MAR hearing that

---

[48]Because the MAR court did not address the issue of whether Petitioner would have been
entitled to submission of the (f)(2) mitigating circumstance, the Court considers this issue under
the *de novo* standard of review. *See Wiggins*, 539 at 534, 123 S.Ct. at 2527.

Strickland had submitted to a full psychological evaluation by Dr. Worthen since the imposition

of his sentence. In the absence of such evidence, this Court is unconvinced by Dr. Worthen's

testimony six years after Petitioner's trial that access to additional medical records would have

enabled him to render an opinion regarding mitigating circumstances.[49]

Having discounted Dr. Worthen's MAR opinion testimony, the Court is left with a fact

pattern similar to that found in *State v. Gainey*. 558 S.E.2d at 482. In *Gainey*, the defendant's

expert witness, a clinical psychologist, testified that the defendant had a chronic mild depressive

condition, a mixed personality disorder with paranoid and schizoid features and a learning

disorder. 558 S.E.2d at 482. Nevertheless, the trial court refused to submit the (f)(2) mitigating

factor to the jury. On appeal the defendant contended that the expert's testimony regarding his

low intelligence and mental illness was sufficient to link his mental and emotional state to the

time of the murder. The North Carolina Supreme Court disagreed. The court noted that the

expert, a Doctor Noble, admitted that his findings were in doubt because the defendant made a

conscious decision not to participate in the evaluation, and Dr. Noble was unable to perform all

of his standard tests. Dr. Noble did not testify that it was his opinion that the murder was

committed while the defendant was under the influence of any mental or emotional disturbance.

In fact, he testified that because of the defendant's failure to cooperate in the evaluations, he did

not have enough information to provide an opinion as to the defendant's state of mind at the time

---

[49]Petitioner relies heavily on Dr. Worthen's 1998 post-conviction affidavit and his testimony at the MAR hearing to support his IAC claims. However, *Strickland v. Washington* warns reviewing courts to avoid the "distorting effects of hindsight" and to evaluate conduct and evidence as it existed at the time of the trial. 466 U.S. at 689. Therefore, this Court views Dr. Worthen's 1995 pre-trial letter to counsel as a more accurate reflection of the extent to which he would have been able to testify at the time of trial.

of the murder. The court found that the evidence defendant presented was not sufficient to warrant submission of the (f)(2) mitigating circumstance. *Gainey*, 558 S.E.2d at 482.

Like Gainey, Petitioner refused to permit Dr. Worthen to conduct a thorough evaluation. (State's PWHC Exhibit D; State's MAR Exhibit 6) As a result, Dr. Worthen, like Dr. Noble, was unable to state with a reasonable degree of professional certainty that Petitioner suffered from any of the disorders diagnosed by medical personnel at Dorothea Dix and Butner. (State's PWHC Exhibit D; State's MAR Exhibit 6) Nor was there evidence offered at the MAR hearing that Dr. Worthen was able to state with a reasonable degree of professional certainty that Petitioner suffered from any of the disorders diagnosed by medical personnel at the Hamlet and Sandhills facilities. (MAR Tpp 149-50) Also like Dr. Noble, Dr. Worthen was unable to give an opinion as to whether the murder was committed while Petitioner was under the influence of any mental or emotional disturbance. (State's PWHC Exhibit D; State's MAR Exhibit 6) Thus, Petitioner has failed to show that the trial court would have been required to submit the (f)(2) mitigating circumstance to the jury had Dr. Worthen had the opportunity to testify regarding the mental health and developmental history contained in the Dorothea Dix, Butner, Hamlet and Sandhills records. *Gainey*, 558 S.E.2d at 482 ("The evidence defendant submitted was not sufficient to warrant the trial court's submitting the (f)(2) mitigating circumstance.").

Even if the Court was to credit Dr. Worthen's MAR testimony that additional records were sufficient to enable him to render an opinion regarding mitigating circumstances, Dr. Worthen's opinion testimony on the (f)(2) factor was tentative, at best. Dr. Worthen did not testify that it was his professional opinion that Petitioner *was* under the influence of a mental or emotional disturbance; he testified that there was "a good likelihood" that he was under the

influence of a mental or emotional disturbance "to some extent." (MAR Tpp 138-39) Furthermore, when Dr. Worthen was informed that after the murder Petitioner told law enforcement officers that alcohol consumption may have caused Henry Brown to run his mouth and get himself killed and that he meant to kill Brown because Brown called him a "punk Indian son-of-a-bitch," Dr. Worthen stated he was no longer comfortable with the opinion he had given regarding Petitioner's mental and emotional state at the time of the murder. (MAR Tpp 149, 150-151) Dr. Worthen stated that he would be more tentative about his opinion. (MAR Tp 151) For the foregoing reasons, Petitioner's claim that he was prejudiced by counsel's failure to discover evidence that would have secured submission of the 15A-2000(f)(2) mitigating circumstance is without merit.

The MAR court did address Petitioner's argument that had Dr. Worthen had access to the additional medical records and Gail Brown and Sherry Strickland's testimony about alcohol and drug use on the night of the murder, Dr. Worthen's subsequent testimony would have warranted submission of the (f)(6) mitigating circumstance. At the MAR hearing, Dr. Worthen testified that based on the medical records he had before trial and the medical records he received from post-conviction counsel, it was his professional opinion,

> to a reasonable degree of professional certainty, a person with [Petitioner's] background who had consumed as much as was reported by [Gail Brown and Sherry Jenkins] most likely would have been impaired as to ability to appreciate the criminality of his actions, most likely would have been impaired at least to some extent.

(MAR Tp 137)

The United States Supreme Court has held that a sentencer "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence."

71

*Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761 (1998) (citations omitted). However, as long as a state's capital sentencing scheme permits the defendant to present all relevant mitigating evidence and does not preclude the sentencing jury from considering that evidence, the state is free to shape and structure the manner in which a jury may consider mitigating evidence. *See Kansas v. Marsh*, __ U.S. __, 126 S.Ct. 2516, 2523, (2006) (citations omitted). To the extent that statutory mitigating circumstances are used "to shape and structure the jury's consideration of mitigation" in a state capital sentencing scheme, they are creatures of state law. *See Buchanan*, 522 U.S. at 275-76 (no constitutional requirement that trial court issue instructions on particular mitigating factors). Because there is no constitutional requirement that mitigating evidence be submitted in the form of statutory mitigating circumstances, whether a defendant is entitled to submission of a particular statutory mitigating circumstance is governed by state law.

The MAR court concluded that Petitioner would not have been entitled to submission of the (f)(6) mitigating factor even if Dr. Worthen had known of Gail Brown and Sherry Strickland's testimony regarding alcohol and drug consumption on the night of the murder because Petitioner had told Dr. Worthen that he had consumed about six beers and three whisky drinks but that he was not out of control.[50] Citing *State v. Golphin*, 533 S.E.2d 168 (2000), the MAR court stated that the (f)(6) mitigating circumstance is not available where a defendant was in control of his actions.

_____

[50]This Court notes for the record that there was no testimony from either Gail or Sherry Strickland about how much Petitioner had to drink on the night of the murder. Both testified that during the night five people drank from a half-full half-gallon bottle of gin. There was no testimony regarding how much Petitioner drank of that half-full half-gallon or how much of the bottle of liquor remained at the time of the shooting.

A state court's decision on a question of state law is binding in federal court. *See Roach v. Angelone*, 176 F.3d 210, 217 (4th Cir. 1999); *Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998). As such, the MAR court's conclusion that Petitioner would not have been entitled to submission of the (f)(6) mitigator based upon Dr. Worthen's testimony at the MAR hearing is not subject to review by this Court. *See Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (A federal habeas court's review is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Because Petitioner could not have been prejudiced by counsels' failure to secure a statutory mitigating circumstance to which he was not entitled under state law, Petitioner's claim that counsel were ineffective for failing to secure the (f)(6) mitigator is without merit.

The Court now turns to the issue of whether Petitioner was prejudiced by trial counsel's failure to discover and present evidence from his mental health, substance abuse, and school records that might have warranted submission of non-statutory mitigating circumstances at sentencing. The United States Supreme Court has held that the only way to determine whether a defendant was prejudiced by his counsel's failure to offer certain mitigating evidence at sentencing is to reweigh the aggravating evidence against *all* of the mitigating evidence adduced both at trial and in the post-conviction proceedings. *See Wiggins*, 539 U.S. at 534, 123 S.Ct. at 2542. The MAR court rejected almost all of Petitioner's IAC claims under the first prong of *Strickland*. The court did not address the broader issue of whether counsels' failure to present evidence from the mental health and substance abuse records was ineffective, separate and apart from whether that evidence would have supported specific statutory mitigating circumstances. Because the MAR court did not analyze Petitioner's claims under the prejudice prong of

73

*Strickland*, the Court is unconstrained by the deferential standard of § 2254(d)(1). *See id.*

Like trial counsel before them, post-conviction counsel did not elicit testimony about Petitioner's "life history," his "developmental and mental health history," "mitigating evidence from his childhood," or "his state of mind in the past" (Brief in Resp. to Resp.'s Mot. For Sum. Judgmt., p. 57) from Dr. Worthen, or any other witness at the MAR hearing. All post-conviction counsel presented was two tentative opinions from Dr. Worthen on mitigating circumstances and Petitioner's school and mental health and substance abuse records.[51] While Petitioner repeatedly criticizes trial counsel for failing to gather Petitioner's school records, he fails to point to any mitigating evidence contained in them. In fact, Petitioner has failed to put forth any argument as to their significance at all.

Additionally, by failing to elicit testimony from Dr. Worthen regarding the significance of the information in Petitioner's mental health and substance abuse records, post-conviction counsel has left it to the Court to determine for itself what might be considered "mitigating" evidence in those records. By having presented his evidence in such a way, Petitioner also has exposed the Court to the wealth of aggravating evidence contained in the records.

Indeed, the aggravating evidence in this case was overwhelming. Not only could the jury consider the evidence of Petitioner's two prior convictions for violent felonies, it also could

---

[51]In his Brief in Response to Respondent's Motion for Summary Judgment, Petitioner devotes a section to counsel's failure to present his Anson County Probation Records as mitigating evidence at sentencing. Petitioner has not raised a claim in the instant Petition for Writ of Habeas Corpus that counsel were ineffective for failing to present this information at sentencing. Nor has Petitioner filed a Motion to Amend his Petition to add such an IAC claim. A brief of law is not the appropriate vehicle for raising a new claim; therefore, this Court will not consider Petitioner's argument that counsel were ineffective for failing to present his Anson County Probation Records as mitigating evidence at sentencing.

consider evidence presented during the guilt/innocence phase of the trial. *See* § 15A-2000(a)(3).

As already noted, the prosecution submitted one aggravating factor for the jury's consideration – that the defendant had been previously convicted of a felony involving the use or threat of violence to the person. *See* § 15A-2000(e)(3). To support this aggravating factor, the prosecution presented evidence that Petitioner had been convicted of voluntary manslaughter for shooting Derrick Skipper in 1993 and convicted of assault with a deadly weapon inflicting serious injury on Todd Kendall in 1994. To prove Petitioner was convicted of the 1993 shooting, the prosecution read to the sentencing jury the indictment, the verdict, and the judgment in that case. The State's evidence showed that Petitioner was indicted for murder but was found guilty by a jury of voluntary manslaughter. That was all of the evidence that the prosecution relied upon to prove that conviction.

For its part, trial counsel called Officer James Clemmons who testified that a gun with four spent rounds was found at the scene of the shooting and that witnesses had reported to him that it had been in Derrick Skipper's possession. (Tp 1484) From this the jury could infer that Skipper was armed at the time of the shooting and that the gun had been fired.

However, evidence that the victim in the 1993 shooting may have shot at and even wounded Petitioner would not have mitigated the fact that Strickland shot Skipper "several times, including firing the gun while standing directly over Mr. Skipper after he had fallen in the street." *State v. Strickland*, 488 S.E.2d at 205. Furthermore, such evidence would have done nothing to mitigate the damaging evidence that the State introduced to prove Petitioner's other previous felony conviction involving the use or threat of violence – the stabbing of Todd

Kendall.  The State's evidence showed that Kendall was unarmed and that Petitioner attempted to slash Kendall across the stomach with a knife.  When Kendall turned and attempted to run, Petitioner slashed him down the back, opening him from shoulder to belt.  Kendall's wife testified that when she saw the wound she was certain her husband was dead and that it took over 800 stitches to repair his back.  She also testified that after he cut her husband, Petitioner attempted to run him over with his truck.  When arrested for the murder of Henry Brown, Petitioner bragged to law enforcement officers about cutting Todd Kendall. (Tp 1455)

Petitioner's mental health and substance abuse records, likewise, are of questionable mitigating value.  In fact, the information in the medical records speaks more to aggravation than to mitigation.

The records indicate that Petitioner was raised in a two-parent household by his mother and step-father.  He denied any physical or sexual abuse by his parents but reported severe physical fighting between himself and his two half-brothers.  During one altercation when he was in the sixth grade, he cut one of his brothers.  He attended school through the tenth grade and got his GED while in a youth offenders camp.  His school records show he was an average student.  He started drinking around nine or ten years of age (fourth grade), when an alcoholic uncle got him drunk and sent him to school intoxicated.  He reported that he started getting out of control in the seventh grade and started having legal troubles.  He was sent to youth offenders camps when he was 17 years old and again when he was 19 years old for larceny and assault.  It was there that he began using marijuana and LSD.

The records indicate that beginning in 1993, after the Derrick Skipper shooting, Petitioner had multiple commitments and diagnoses of alcohol dependence and behavioral and mental

76

disorders. In October, 1993, three months after he killed Skipper, Petitioner was admitted to Dorothea Dix after he threatened to kill himself. He was diagnosed as having alcohol dependence and antisocial personality disorder. (Pet. Exhibit 104)

On March 16, 1994, he was admitted to Hamlet Hospital/Sandhills Medical Clinic for homicidal ideation and alcohol abuse. He had been drinking and had decided to get even with an enemy of his. While in the process of collecting his guns, he became sick due to drinking while on Antabuse and his enemy got away before Petitioner could harm him. After drinking for several more days, he checked himself into the hospital stating that he needed treatment for his alcoholism and that he was fearful that he might harm someone. Petitioner's attending physician made the following observations subsequent to a mental status examination: "[Petitioner] admits to recent homicidal ideation, but states that he is glad at this point that he did not end up harming someone and possibly getting himself in further trouble. . . . He comes from an environment which seems to be extremely violent and has a history of violent acts himself with frequent gun fights."[52] Petitioner was released two days later with a diagnosis of alcohol dependence and paranoid personality disorder. (Pet. Exhibit 106)

On April 4, 1994, Petitioner was admitted to Butner for treatment for his alcohol dependence. He reported that he "has a severe alcohol problem and he becomes extremely violent to the point that he is shooting at people and tearing up things." Petitioner remained in treatment until April 18, 1994, when he received a three-day pass to attend his biological father's funeral. He did not return to complete his treatment. His discharge diagnosis was alcohol

_____

[52]Petitioner's records from Dorothea Dix and Butner refer to multiple gunshot and stab wounds. (Pet. Exhibits 104 & 105)

dependence and psychotic disorder. (Pet. Exhibit 105)

On May 16, 1994, Petitioner was referred to Dorothea Dix on an involuntary commitment because of depression and suicidal thoughts while awaiting trial for killing Derrick Skipper. During this commitment he tested positive for marijuana. He was discharged seven days later with a diagnosis of major depressive episode, alcohol abuse and antisocial personality disorder. (Pet. Exhibit 104)

On February 23, 1995, Petitioner was committed to Dorothea Dix for an evaluation of his capacity to proceed to trial for the murder of Henry Brown. He was diagnosed with antisocial personality disorder and alcohol dependence.[53] The psychiatrist who evaluated Petitioner determined that he was capable of proceeding to trial and that he did not have a mental disease or defect which would have prevented him from understanding the difference between right and wrong at the time of the alleged offense. (Pet. Exh. 104)

There is nothing in these records that would have led the jury to conclude anything other than that Petitioner is an extremely dangerous and violent person, who becomes even more violent when he is under the influence of drugs or alcohol. It is not reasonably probable that the jury would have been swayed toward a life sentence by the knowledge that Petitioner had had multiple commitments for alcohol dependence and homicidal or suicidal episodes and was therefore on notice that he had the tendency to become violent when under the influence of alcohol and drugs. In fact, it is more likely that the jury would have concluded that Petitioner was acting in conformity with previous behavior when, after voluntarily consuming alcohol and

---

[53]The Court notes that Petitioner refused to sign a medical release so that Dorothea Dix personnel could obtain his mental health records from Butner, Hamlet and Sandhills, indicating that his lack of cooperation was not limited to his defense team. (Pet. Exh. 104, p.3)

drugs, he shot Henry Brown in the back over a racial slur.

Furthermore, Petitioner's own medical expert's testimony was limited by Petitioner's refusal to allow a complete evaluation. Prior to trial, Petitioner had had five separate commitments and had been diagnosed with three different disorders. As Dr. Worthen explained in his pre-trial letter to counsel, he was unable to confirm that Petitioner suffered from *any* mental disorder because of Petitioner's refusal to cooperate with an evaluation. (Def. Exh. D; MAR Exh, 6) Additionally, any opinion that Dr. Worthen could have given regarding Petitioner's mental state on the night of the murder would have been, by his own admission, tentative at best. The Court finds it significant that at the MAR hearing, there was no testimony that Petitioner actually suffered from a mental disorder at the time of the shooting.

Finally, the aggravating evidence from the guilt/innocence portion of the trial was overwhelming. The uncontroverted evidence shows that Petitioner shot Henry Brown, who Petitioner had no reason to believe was armed (Tp 1209), in the back while Brown was seated. Additionally, the jury heard Petitioner's own damning statements about the murder. Petitioner told Agent Underwood and Detective Tucker that he had shot Henry because Henry had "pissed him off," had called him a "punk-ass Indian son-of-a-bitch," and that he "meant to kill him." (Tp 1210) Strickland also told them that he stood close to Henry when he shot him because he didn't want to miss him, and that he had to cock the gun to get it to shoot. (Tp 1210) From this evidence, it was reasonable for the jury to conclude that Petitioner was angry but not out of control when he shot Brown, and that there was nothing interfering with Petitioner's capacity to understand his actions and their implications.

For the foregoing reasons, Petitioner has failed to show that he was prejudiced by trial

counsel's failure to discover some medical records or their failure to present mitigating evidence contained in those records.[54] *See Wiggins*, 539 U.S. at 534, 123 S.Ct. at 2542.  Petitioner's claims of ineffective assistance of counsel at sentencing are denied.

## CLAIM V: JURY SELECTION ISSUES

### A: Restriction of Jury Voir Dire Concerning Juror Note

Petitioner claims that the trial court's refusal to permit him to question prospective jurors about their submission of a note to the trial court deprived him of his Sixth, Eighth and Fourteenth Amendment rights.  In the note submitted at the conclusion of the first day of jury selection, one or more prospective jurors asked whether "the Defendant keep[s] his notes about jury and names." (Pet. Exh. 47)  When trial counsel attempted to question prospective jurors about the note, the Court sustained the State's objections. (Tp 384)  The trial court then conducted a bench conference, at which "[t]he court heard arguments from both sides concerning the admissibility of the note and at the conclusion of that sustained the State's objection to the questions pertaining to the note, which were asked by the defendant." (Tpp 397-98) Consequently, Petitioner argues, the trial court unduly restricted the scope of his questioning and prohibited him from obtaining information about any biases or preconceived fears held by prospective jurors.

---

[54]In his Brief in Response to Respondent's Motion for Summary Judgment, Petitioner notes that his trial attorneys asked no one about his childhood and presented no evidence about his parents, grand-parents, and siblings or about how or where he was raised. (Resp. to Mot. For Sum. Judgmt., p. 18)  Leaving aside Petitioner's instructions to counsel that they were not to present any such evidence, the Court notes that Petitioner did not present any information about his parents, grand-parents, siblings, and up-bringing to the MAR court for its consideration. Therefore, this Court is unable to assess whether such failure on the part of trial counsel was prejudicial to the outcome of Petitioner's sentencing trial.

Petitioner raised his Sixth and Fourteenth Amendment claims on direct appeal before the North Carolina Supreme Court as Issue No. I in the Defendant-Appellant's Brief. (Pet. Exh. A) The North Carolina Supreme Court found that the trial court permitted Petitioner to question prospective jurors in detail about any biases they may have had against him, and that the trial court, therefore, did not abuse its discretion in limiting Petitioner's questions concerning the circumstances that gave rise to the prospective jurors' note. *See State v. Strickland*, 488 S.E.2d 194, 200 (NC 1997). The North Carolina Supreme Court's rejection of this claim was not contrary to or an unreasonable application of established Federal law. § 2254(d).

The Sixth and Fourteenth Amendments "guarantee[ ] a defendant on trial for his life the right to an impartial jury." *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992). Voir dire plays an essential role in guaranteeing a criminal defendant's right to an impartial jury. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality opinion). Voir dire "enabl[es] the court to select an impartial jury and assist[s] counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991).

How the voir dire is conducted, however, is committed to the sound discretion of the trial court. *See Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976). Accordingly, the Supreme Court generally has declined to dictate the form and content of voir dire questions. *See Mu'Min*, 500 U.S. at 425, 111 S.Ct. at 1905 (questions about the content of publicity to which jurors were exposed was not constitutionally required). Instead, the issue is one of fairness. *See Morgan*, 504 U.S. at 730 (citing *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 471-72, 75 L.Ed. 1054 (1931)). In other words, in order for certain questions,

or a certain line of questioning, to be constitutionally compelled, "it is not enough that such questions might be helpful.  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min*, 500 U.S. at 425-26, 111 S.Ct. at 1905 (citing *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)).

The trial court and the attorneys for the defense conducted an extensive voir dire. Prospective jurors were questioned in detail regarding sources of potential bias against Petitioner. Prospective jurors were asked whether they knew Petitioner, the victim, the attorneys, or any of the potential witnesses in the trial.  They were asked about any relationship they or family members had with law enforcement.  They were asked whether they or any family members had been victims of a crime and about any experiences they had had serving on a jury.  They were asked repeatedly by the defense about any exposure they may have had to pre-trial publicity:

> "Before today had any of you heard anything at all about the case?" (Tp 344)

> "Those of you who did hear something about it or read about it, uh, did you form an opinion at that time, whether you still have it or not, but did you form an opinion at that time about the guilt or innocence of the person that you read about in the paper at that time?" (Tpp 346, 388)

> "Have you been present when you heard anybody else discussed any aspect of the case?" (Tp 347)

They were asked a similar question by the trial court, "Can each of you who read something about this case, lay aside whatever you may have read about this matter and decide this case solely based upon the evidence which is introduced at this trial?" (Tpp 380-81)

After the trial court sustained the state's objection to questions regarding the note, trial counsel asked a number of questions regarding any discussions jurors may have had amongst themselves:

"Have you discussed any aspect of this case with any other jurors up until now? (Tp 383)

"Was there any discussion of the case among any of you as you waited while we were going through the jury selection process for the others to come in the jury room?" *Id.*

"We went through a process where each were questioned individually about the death penalty aspect and the rest of you waited in the jury room. Was there any discussion among those that waited in the jury room about that that you recall?" *Id.*

The trial court allowed the defense to ask, over the state's objection, whether Petitioner's race would be a factor: "My client is an American Indian. Uh, do any of you feel like that that [sic] might have any impact on how you would see this case?" (Tp 383)

The voir dire allowed by the trial court was sufficient to probe the prospective jurors for bias and partiality. Therefore, the trial court's refusal to allow Petitioner to question jurors about the note did not render his trial fundamentally unfair. The North Carolina Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established Federal law. *See* § 2254(d)(1).

**B: Jurors Removed as a Result of Reservations About the Death Penalty**

During jury selection, the State challenged for cause prospective jurors Kathy Privette, Judy Frick and Donna Kierce based on their responses to its questions regarding the death penalty. The trial court granted the State's challenges and excused the jurors for cause. Petitioner claims that these jurors were improperly excused for cause and that as a result he was denied his Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury comprised of a fair cross-section of the community, his right to be free from cruel and unusual punishment, and his right to due process of law.

The North Carolina Supreme Court denied this claim in summary fashion based upon its

prior holdings. *See State v. Strickland*, 488 S.E.2d at 208-209. The court's summary denial constitutes an adjudication on the merits, and the deferential standard of review outlined in § 2254(d)(1) still applies. *See Bell v. Jarvis*, 236 F.3d at 158. Therefore, this Court will conduct an independent examination of the record and the clearly established Supreme Court law while still applying the deferential standard required by § 2254(d)(1). *See id*.

The United States Constitution does not prohibit a state from "death qualifying" a jury in a capital case. *See Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 1764 (1986). A prospective juror may be excluded for cause when his or her views on the death penalty would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526 (1980)). This standard does not require that a juror's bias "be proved with 'unmistakable clarity.'" *Witt*, 469 U.S. at 424. As the *Witt* Court noted, "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'." *Id*. at 424-35. Therefore, the question of challenge for bias is a "factual issue," and a trial judge's determination of juror bias is presumed to be correct under § 2254(e)(1). *See id.* at 429-31. Petitioner may rebut this presumption of correctness with clear and convincing evidence. § 2254(e)(1).

Petitioner claims that prospective jurors Privette, Frick and Kierce were improperly excused for cause. Petitioner argues that jurors Privette and Frick stated that they could follow the law, but that it would be difficult for them to do so. As for juror Kierce, Petitioner asserts that she was unable to state whether she could follow the law as instructed because she had never been placed in that position before and therefore did not know what she would do.

84

Contrary to Petitioner's assertions, juror Privette told the court that she would be unable to recommend the death penalty under any circumstances:

> THE COURT: As I understand what you're saying, you could not return a recommendation that the death penalty be imposed in this case no matter what the evidence and the facts were?
> KATHY PRIVETTE: Yes, sir.

(Tp 308)  The trial court then granted the State's challenge for cause.

As for jurors Frick and Kierce, after extensive questioning by the prosecution, the defense and the court, both women admitted that their views on the death penalty would "'prevent or substantially impair the performance of [their] duties as juror[s]." *Wainwright v. Witt*, 469 U.S. at 424.

> THE COURT: Do you feel your views on capital punishment would prevent or substantially impair your ability to vote or to impose the death penalty?
> JUDY FRICK: Yes, I do.

(Tp 583)

> THE COURT: Do you feel that your personal views about capital punishment would prevent or substantially impair the performance of your duties as a juror in accordance with your instructions and oath?
> DONNA KIERCE: Yes, sir, I do.

(Tp 629)  The court granted the state's motion to excuse each woman for cause.

Petitioner has failed to show that the trial court erred in excusing prospective jurors Privette, Frick and Kierce for cause.  All three indicated by their answers, either directly or indirectly, that their feelings about the death penalty would prevent or substantially impair their ability to follow the law and their oaths as jurors.  (Privette: Tp 308; Frick: Tpp 575, 583; Kierce: Tp 629)  Therefore, the State court's adjudication of this claim was neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d)(1).

**C: Juror Exposure to Newspaper Article**

Petitioner alleges that the jurors who heard his case were exposed to newspaper articles that informed them that Petitioner "had been previously convicted of a shooting in 1993, had recently been convicted of another offense of voluntary manslaughter and was on parole when he committed the acts that were the subject of the trial."[55] (PWHC, p. 141)  Petitioner argues that this exposure amounted to prejudicial misconduct on the part of the jury, thereby depriving him of his rights to a fair and impartial jury, a reliable sentencing hearing, freedom from cruel and unusual punishment and due process of law as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

Petitioner raised this claim on direct appeal before the North Carolina Supreme Court as Issue No. XXX in the Defendant-Appellant's Brief.[56] (Pet. Exh. A)  The North Carolina Supreme Court denied the claim in summary fashion based upon its prior holdings.  *See State v. Strickland*, 488 S.E.2d at 208-209.  Therefore, this Court will conduct an independent

---

[55]The conviction for the 1993 shooting and the voluntary manslaughter conviction were one and the same, not two separate convictions as implied above.  Additionally, Petitioner was out of jail on bond, not parole, when he killed Henry Brown.  Petitioner has not produced any newspaper articles containing these misstatements of fact.  Therefore, the Court can only conclude that Petitioner is mistaken regarding the information to which jurors allegedly were exposed.

[56]The posture of this claim is different from that raised on direct appeal.  See 28 U.S.C.A. § 2254(b)(1)(A) ("An application for a writ of habeas corpus ... shall not be granted unless ... the applicant has exhausted the remedies available in the courts of the State ...." (emphasis added)).  On direct appeal, Petitioner claimed that the trial court erred in denying his motions to strike the jury panel for cause based upon the jurors exposure to pretrial publicity.  There is no such allegation of trial error in the claim raised in his Petition for Writ of Habeas Corpus.  Instead, Petitioner alleges that the jurors' exposure to pretrial publicity amounted to prejudicial juror misconduct.  Regardless, this Court is satisfied that "both the operative facts and the controlling legal principles" of Petitioner's claim were fairly presented to the state courts. *Matthews v. Evatt*, 105 F.3d at 911.

examination of the record and the clearly established Supreme Court law while still applying the deferential standard required by § 2254(d)(1). *See Bell v. Jarvis*, 236 F.3d at 158.

As the U.S. Supreme Court noted in *Irvin v. Dowd*, among the protections guaranteed by the Sixth Amendment is the right to an impartial jury that determines its verdict "based upon the evidence developed at trial." 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *see also Turner v. Louisiana*, 379 U.S. 466, 472-73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) ("[T]he evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." (internal quotation marks omitted)). An impartial jury necessarily is one free from extraneous, prejudicial influence, whether it comes from inside or outside the jury room. *See Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) (holding admissible the testimony of jurors describing how they heard and read prejudicial information not admitted into evidence).

Petitioner's claim of juror misconduct borders on the frivolous. On the second day of jury selection, prospective juror Kathy Privette reported that she had overheard another prospective juror state that he or she had read in the newspaper that Petitioner "was on parole" when the shooting occurred. (Tpp 305-307) On the fourth day of jury selection, prospective juror Leon Helms informed the court that there had been a newspaper with Petitioner's picture on it in his jury room since the second day of jury selection. (Tpp 668-70) Because these revelations occurred during jury selection, both defense counsel and the trial court were able to question prospective jurors about their alleged exposure. The record shows that all of the jurors who heard Petitioner's case were questioned extensively and without limitation by counsel for the

defense, and in some instances by the court, regarding whether they had heard or read anything about the case; whether they had heard anyone express an opinion about the case or Petitioner; whether they had heard anyone discuss any facts from the case; whether they had discussed the case with anyone; and whether they had formed an opinion about the case based upon anything they might have heard about the case. (Tpp 344-48; 380-84; 388; 496-98; 668-69; 735) Counsel for defense used peremptory challenges to excuse every prospective juror who stated that he or she had read or heard something about the case (Duncan, McLain, Frazier, and Gizinski), except for jurors Guillen and Rushing, both of whom the defense accepted.[57] Counsel for defense also used peremptory challenges to excuse jurors Helms and Gordon, both of whom had seen, but not read, the newspaper that had been left in the jury room. However, the defense accepted juror Taylor who had seen the same paper. Thus, the only members of the jury who had been exposed to pretrial publicity (Guillen, Rushing and Taylor) were those whom the defense accepted as jury members.

Having knowingly accepted jurors who were exposed to pretrial publicity, Petitioner cannot now complain that those jurors were exposed to pretrial publicity.[58] Furthermore, Petitioner has failed to cite any case that holds that prospective jurors' exposure to pretrial publicity constitutes juror misconduct. Therefore, the Court can only conclude that by raising this claim, Petitioner is asserting that some or all of his remaining jury members lied during voir dire about their exposure to pretrial publicity and/or their ability to set aside what they knew and

---

[57]Jurors Privette, Miller and Price, who also acknowledged having heard or read something about the case, were excused by the court for other reasons.

[58]Petitioner did not exhaust his peremptory challenges, so he was not required to accept these jurors.

to decide the case solely from the evidence presented at trial.

In *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), the Supreme Court set out a two-pronged test for determining whether a new trial is required in the case of juror deceit during voir dire or on jury questionnaires. A petitioner "must first demonstrate that a juror failed to answer honestly a material question ... and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id*. at 556, 104 S.Ct. 845. In the instant case, Petitioner has failed to provide any evidence that any of his jurors failed to truthfully answer any of the questions regarding exposure to pretrial publicity. Furthermore, Petitioner has failed to demonstrate that had his jurors acknowledged being exposed to pretrial publicity, such exposure would have been a valid basis for challenge for cause.

Petitioner has failed to provide any evidence that any of his jurors engaged in misconduct. Therefore, the North Carolina Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established Federal law. *See* § 2254(d)(1).

### CLAIM VI: USE OF A "SHORT-FORM" INDICTMENT

Petitioner claims that his Sixth and Fourteenth Amendment rights to notice of the charges against him and to due process of the law were violated by the State's use of the statutory "short form" indictment permitted by N.C. Gen. Stat. § 15-144. Petitioner claims that the short-form indictment failed to allege each element of the crime of first-degree murder and the aggravating circumstance relied upon by the State in seeking the death penalty. He contends that these omissions render his first-degree murder conviction and death sentence invalid under *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), and *Apprendi v. New*

*Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and that the trial court, therefore, was without jurisdiction to try him for any offense greater than second-degree murder.

Petitioner raised this claim as a preservation issue on direct appeal before the North Carolina Supreme Court as Issue No. XXV in the Defendant-Appellant's Brief. (Pet. Exh. A) The North Carolina Supreme Court denied the claim in summary fashion based upon its prior holdings. *See State v. Strickland*, 488 S.E.2d at 208-209. The court's summary denial constitutes an adjudication on the merits and the deferential standard required by § 2254(d)(1) still applies. *See Bell v. Jarvis*, 236 F.3d at 158.

Consistent with § 15-144, the heading of Petitioner's indictment identified the charged crime as "MURDER," listed Petitioner as the defendant, and set forth the date and the county of jurisdiction. (Pet. Exh. 112) The body of the indictment alleges the elements of common law murder. "[A] short-form indictment that alleges the elements of common law murder is sufficient to satisfy the demands" of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *Hartman v. Lee*, 283 F.3d 190, 198-99 (4th Cir. 2002) (relying on *Davis v. Territory of Utah*, 151 U.S. 262, 14 S.Ct. 328 38 L.Ed. 153 (1894) and *Bergemann v. Backer*, 157 U.S. 655, 15 S.Ct. 727, 39 L.Ed. 845 (1895)).

With regard to the assertion that the trial court lacked jurisdiction because the indictment failed to allege the aggravating factors the State used to seek the death penalty, *Apprendi* and *Jones* state a new rule of constitutional law that cannot be applied retroactively to cases on collateral review. *See United States v. Sanders*, 247 F.3d 139, 151 (4th Cir.), *cert. denied*, 535 U.S. 1032, 122 S.Ct. 573, 151 L.Ed.2d 445 (2001); *see also Schriro v. Summerlin*, 542 U.S. 348, ----, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004) ("*Ring* [*v. Arizona*, 536 U.S. 584, 122 S.Ct.

90

2428, 153 L.Ed.2d 556 (2002)] announced a new procedural rule that does not apply retroactively to cases already final on direct review.").  Therefore, the North Carolina State Court's rejection of this claim was neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d)(1).

### *Equal Protection Clause*

Petitioner also claims that his Fourteenth Amendment rights under the Equal Protection Clause were violated by the State's use of the statutory "short form" indictment permitted by N.C. Gen. Stat. § 15-144.[59]  When he raised his "short-form" indictment claim on direct appeal before the North Carolina Supreme Court, Petitioner asserted only that use of the "short form" indictment violated his right "not to be placed in jeopardy twice for the same offense, not to be prosecuted for a felony without an adequate indictment, to notice of the accusation against him, to a reliable capital trial and sentencing hearing, and not to be deprived of life without due process . . . ."  Nowhere does he cite the Equal Protection Clause; nor does he assert that defendants charged with murder, rape or a sex offense are treated differently through use of the short-form indictment than defendants charged with all other crimes.  In short, he did not raise an Equal Protection claim.

Petitioner concedes that he did not exhaust his Equal Protection claim in the state courts and that it is procedurally defaulted on federal habeas review.  (July 25, 2005 Brief on Proc. Dflt. p. 19)  Additionally, Petitioner has failed to show cause and prejudice or that a fundamental miscarriage of justice would occur to excuse the procedural default. *See Coleman v. Thompson*,

_____

[59]Respondent did not acknowledge or address Petitioner's Equal Protection claim until this Court issued its second Order requiring the parties to brief the issue of procedural default.

501 U.S. at 750.  Therefore, Petitioners Equal Protection claim is procedurally defaulted on habeas review.

**CLAIM VII: COUNSEL INEFFECTIVE FOR CONCEDING PETITIONER'S GUILT**

Petitioner claims that during the jury selection process, trial counsel repeatedly made concessions of guilt without his permission.  In particular, Petitioner argues that trial counsel's repeated statements during jury selection that Petitioner was holding the gun that killed the victim at the time the victim was shot amounted to a concession of guilt to which he had not agreed.  Petitioner argues that these concessions of guilt deprived him of his right to have the State prove his guilt beyond a reasonable doubt and his right to effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.

Petitioner raised this claim on direct appeal before the North Carolina Supreme Court as Issue No. II in the Defendant-Appellant's Brief. (Pet. Exh. A)  The North Carolina Supreme Court denied the claim on the merits.  *See State v. Strickland*, 488 S.E.2d at 200.  Petitioner also raised this claim in his MAR as Claim A 1(c).  The MAR court held that this claim was procedurally barred by N.C. Gen. Stat. § 15A-1419(a)(2) because the issue was raised and rejected in Petitioner's direct appeal. (Pet. Exh. 109, p. 4)

The North Carolina Supreme Court found as a matter of fact that trial counsel's statements did not amount to an admission of Petitioner's guilt. *State v. Strickland*, 488 S.E.2d at 200.  Therefore, this Court is bound by the State court's factual finding, absent clear and convincing evidence that the finding of fact was erroneous. *See* § 2254(e)(1).

In this matter, the finding of fact was not erroneous.  Trial counsel made it clear that the defense would not be contesting who shot the victim, but it would be contesting that he did it

92

with "malice aforethought." (Tpp 502; 826) Counsel's strategy was to convince the jury that the shooting was not premeditated or carried out with malice but was an accident or, at worst, voluntary manslaughter. (MAR Tpp 17-19 & 72) In furtherance of that strategy, counsel called a firearms expert to testify that the particular shotgun that killed the victim was susceptible to going off even if the trigger was not pulled. (Tpp 1300; 1302-104) Counsel also elicited testimony from Agent Underwood on cross-examination that Petitioner had told him that the gun went off when he pumped it and that he did not know if his finger was on the trigger at the time. (Tp 1216) Finally, counsel secured instructions to the jury on voluntary manslaughter, involuntary manslaughter and accident.

Furthermore, Petitioner suffered no prejudice from counsel's acknowledgment to the jury that he shot Brown. Contrary to Petitioner's assertion that there was "some" evidence that he shot Brown, the evidence that he shot Henry Brown was overwhelming and uncontroverted. Therefore, it is not reasonably probable that the jury would have acquitted Petitioner had trial counsel not conceded the fact that Petitioner shot Brown.

Petitioner has failed to show that trial counsel's conduct was deficient for conceding to the jury that he shot Brown. *See Strickland*, 466 U.S. at 687. Likewise he has failed to show that he was prejudiced by counsel's concession. *See Wiggins*, 539 US at 534 (quoting *Strickland*, 466 U.S. at 694). Therefore, he has failed to show that the North Carolina Supreme Court's rejection of this claim was an unreasonable application of clearly established Federal law.

## CLAIM VIII: COUNSEL INEFFECTIVE FOR INFORMING JURY OF PETITIONER'S CRIMINAL RECORD

During his opening statement at the guilt/innocence phase of the trial, counsel for the

defense stated that "My client has a record. It will probably come out. It ain't good. Don't judge him by that." (Tp 959) Petitioner did not testify at trial, and no evidence of his criminal record was admitted during the guilt/innocence phase of the trial. Petitioner claims that counsel's statement to the jury regarding his criminal record deprived him of his Sixth and Fourteenth Amendment rights to effective assistance of counsel.

Petitioner raised this claim on direct appeal before the North Carolina Supreme Court as Issue No. III in the Defendant-Appellant's Brief. (Pet. Exh. A) The North Carolina Supreme Court denied the claim on the merits. *See State v. Strickland*, 488 S.E.2d at 201. Petitioner also raised this claim in his MAR. The MAR court found that it was procedurally barred pursuant to § 15A-1419(a)(2) because Petitioner previously had raised it on direct appeal.

The North Carolina Supreme Court concluded that regardless of any deficiency on the part of counsel, Petitioner had failed to show that he was prejudiced under *Strickland v. Washington* by his counsel's admission to the jury that he had a bad criminal record. *See State v. Strickland*, 488 S.E.2d at 201. Assuming *arguendo* that it was deficient performance for counsel to tell the jury at the beginning of the guilt phase that Petitioner had a bad criminal record, Petitioner cannot show that he was prejudiced by counsel's statement. As this Court has noted numerous times, evidence of Petitioner's guilt was overwhelming. He shot a man he had no reason to believe was armed in the back over a racial slur. He then bragged to police about having killed the victim, telling them that he had intentionally stood close to the victim because he did not want to miss.

Given the overwhelming nature of the evidence, there is no reasonable probability that the verdict in this case would have been different had the jury not heard counsel make a single,

isolated remark at the very beginning of the trial that his client had a record and that it was not good. *See Wiggins*, 539 US at 534 (quoting *Strickland*, 466 U.S. at 694). For the foregoing reasons, the North Carolina Supreme Court's rejection of this claim was not an unreasonable application of established Federal law. *See* § 2254(d)(1).

## CLAIM IX: PETITIONER DEPRIVED OF RIGHT TO PRESENT EVIDENCE OF INNOCENCE OF FIRST-DEGREE MURDER

Petitioner claims he was deprived of his Sixth and Fourteenth Amendment rights to due process, to compulsory process, to confront the witnesses against him and to present a defense when the trial court prevented him from presenting evidence of prior bad acts by the victim. Specifically, Petitioner attempted to present evidence through Gail Brown, Agent Underwood and Sherry Strickland that Henry Brown had assaulted Gail Brown in the past, including an incident several weeks prior to the shooting, and that Petitioner knew about the prior assault. Petitioner also claims that the trial court improperly excluded evidence, offered through Sherry Strickland, that throughout the night of the shooting, Henry Brown made a number of "threatening and ugly comments." Petitioner argues that this evidence was admissible under Rule 404(b) to show that Petitioner did not commit murder with premeditation and deliberation but instead was acting out of anger and fear. *See* N.C. Gen. Stat. § 8C-1, Rule 404(b) (1992).

Petitioner raised this issue as three separate assignments of error (IV, V and VIII) in Defendant-Appellant's Brief to the North Carolina Supreme Court. (Pet. Exhibit A) The North Carolina Supreme Court denied the claims on the merits, holding that evidence of Henry Brown's prior assaults on his wife was inadmissible pursuant to Rule 404(b) because under the defense theory of the case – that the shooting was an accident – evidence of the victim's prior

bad acts was not relevant to his killing.[60] *State v. Strickland*, 488 S.E.2d at 201, 203.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment ... or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, ... the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)) (internal citations omitted); *see also Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (indicating that "the right to present a defense" is a "fundamental element of due process of law"). However, a "meaningful opportunity to present a complete defense" does not translate into the right of a defendant to present any evidence he may deem important to his defense. *See Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (A defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."). Indeed, it is well established that a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

---

[60]Petitioner argues that the North Carolina Supreme Court did not address his claim regarding his statement to Agent Underwood that he was aware that Henry Brown had assaulted Gail Brown prior to the murder. (Pet.'s Exh. A, Claim V) However, it appears that the State court addressed this claim in the section of its decision upholding the trial court's exclusion of testimony by Gail Brown that Henry had assaulted her. *See State v. Strickland*, 488 S.E.2d at 201. In that section of the decision, the State court refers both to Brown's prior assaultive behavior and to Petitioner's knowledge of it. *See id.* Voir dire of Gail Brown provided evidence of the first, while voir dire of Agent Underwood provided evidence of the later. Thus, it appears that the State court was addressing the relevance of the proffered evidence from both witnesses. *See id.*

"[S]tate . . . rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987)). Accordingly, the Constitution leaves judges "wide latitude" to exclude evidence that is only "marginally relevant." *Crane*, 476 U.S. at 689, 106 S.Ct. 2142.

Petitioner does not argue that North Carolina's Rule 404(b), which is identical to Rule 404(b) of the Federal Rules of Evidence, is either "arbitrary" or "disproportionate to the purpose[] [it is] designed to serve." *Scheffer*, 523 U.S. at 308.  Furthermore, habeas relief is not warranted "unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Burket v. Angelone*, *supra*, 208 F.3d at 186 (citations omitted); *see also Chambers*, 410 U.S. at 302- 03 (erroneous exclusion of evidence amounts to constitutional error if it deprives the defendant of a fundamentally fair trial).

Under Rule 404(b), in order to introduce evidence of prior bad acts by the victim to prove the defendant's state of mind at the time of the killing, the defendant must show that he was aware of the prior bad acts and that his awareness somehow was related to the killing. *State v. Strickland*, 488 S.E.2d at 201 (citing *State v. Smith*, 447 S.E.2d 376, 380 (NC 1994)).  The voir dire cross-examination of Agent Underwood and Sherry Strickland's offer of proof revealed that Petitioner was aware that the victim had assaulted his wife in the past.  Petitioner argues that evidence of the victim's prior acts of violence against his wife tended to show that Petitioner acted out of anger and fear when he pointed the shotgun at the victim.  However, as the North

Carolina Supreme Court noted, Petitioner presented no evidence that he was afraid of the victim or that he was acting in self-defense when he shot the victim. In fact, Petitioner's own statements to the police indicate that he did not shoot Brown out of fear. Petitioner made no mention to investigators of his knowledge of Brown's assault on his wife until specifically asked by Agent Underwood whether he was aware of the fact. While Petitioner responded that he was aware of at least one prior assault, he also told Agent Underwood that it had nothing to do with his killing of Brown. Furthermore, he told police that he had no reason to believe Brown was armed when he shot him. Finally, the physical evidence showed that Brown was shot in the back while seated, indicating that he was not in an aggressive, adversarial posture at the time of the shooting.

Petitioner likewise failed to show any connection between Petitioner's anger at the victim and his knowledge that the victim had assaulted his wife a few weeks previously. For example, there is no assertion that Petitioner was angry at Henry Brown because he knew Henry had assaulted Gail. On the contrary, Petitioner's defense was that he was angry at the victim for using a racial slur, that he pointed the shotgun at the victim to get him to leave and that the gun went off accidentally. *See State v. Goodson*, 341 N.C. 619, 623, 461 S.E.2d 740, 742 (1995) (where defendant claimed that shooting his wife was accidental, evidence as to wife's reputation for violence was inadmissible).

Thus, the North Carolina Supreme Court's conclusion that evidence of Henry Brown's prior assaults on his wife was not admissible under Rule 404(b) was not erroneous. Furthermore, exclusion of such evidence did not preclude Petitioner from offering a complete defense. *See Daniels v. Lee*, 316 F.3d 477, 489 (4th Cir. 2003) ("[T]he right to present a defense is fundamental, but exclusion of evidence reached constitutional proportions in *Washington* [*v.*

*Texas*] and *Chambers* [*v. Mississippi*] only because it significantly undermined fundamental elements of the accused's defense." (internal quotations and citations omitted)). As noted previously, Petitioner's chosen defense was that the shooting was an accident and to that end he presented evidence from a firearms expert that the type of shotgun he pointed at Brown was capable of discharging without the trigger having been pulled. He also presented evidence that both he and Brown had been drinking and that they had smoked marijuana. The jury heard that Brown's blood alcohol content was .18 and that Petitioner had told Brown to leave several times. Furthermore, Petitioner told police that he had pulled the gun out of the cabinet to get Brown to leave and that the gun went off when he "racked it" but that he did not know if his finger was on the trigger when it went off. Finally, defense counsel secured jury instructions on involuntary manslaughter and accident. For the foregoing reasons, the North Carolina Supreme Court's conclusion that the trial court did not err in excluding evidence of Henry Brown's prior assaults on his wife was neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d)(1).

As for Petitioner's claim that the trial court erroneously prohibited Sherry Strickland from testifying regarding Henry Brown's "threatening and ugly" behavior on the night of the murder, the Court finds that there is no factual basis for this claim. Petitioner asserts that Sherry was prohibited from testifying that Henry Brown used profanity on the night of the murder, that he was obnoxious and loud, that he stated that he was going to "whip [Petitioner's] tail and that she thought Brown sounded serious when he said it,"[61] that he called Petitioner a "son of a bitch" and

---

[61]Petitioner asserts that Sherry testified on voir dire that the last time she heard Brown tell Strickland that he was going to whip his tail was fifteen (15) minutes before the shooting. This is a misstatement of fact. Sherry testified that the last time she heard Brown tell Strickland that he

that she was nervous that Brown might start an argument that would end in a fight. (PWHC, p. 164, ¶ 708) In fact, the record shows that Sherry Strickland was allowed to testify before the jury about all of this behavior. (Tpp. 1235-1237; 1252; 1261-62) Also contrary to Petitioner's assertions, Sherry was allowed to testify that on several occasions Petitioner told Brown that he needed to leave and that she heard Brown mumble something before he was shot. (Tpp. 1233; 1247; 1263; 1260) Because there is no factual basis for Petitioner's claim that Sherry Strickland was prohibited from testifying about Henry Brown's "threatening" behavior on the night of his murder, this portion of Petitioner's claim is dismissed.

### Penalty Phase

In addition to the Sixth and Fourteenth Amendment claims addressed above, Petitioner asserts that he was deprived of his rights under the Eighth Amendment. He argues that he was prejudiced at sentencing when the trial court refused to admit testimony at the guilt/innocence phase of the trial regarding past acts of violence by the victim, Petitioner's knowledge of those past acts and statements made by the victim on the night of the murder. Specifically, Petitioner argues that the degree of premeditation, deliberation and malice in the commission of a murder are extremely important to a jury when it is deliberating the issue of a death sentence versus life in prison. Petitioner argues further that had the jury heard evidence of the conduct of the victim on the night of his murder and his prior history of violence, at least one juror would have voted in favor of a life sentence. Thus, Petitioner argues, he is entitled to a new sentencing hearing.

Petitioner failed to "fairly present" this claim in the State courts. In his brief to the North Carolina Supreme Court on direct appeal, Petitioner raised claims IV, V and VIII under the

_____

was going to "whip his tail" was *forty-five* (45) minutes before the shooting. (Tpp. 1239-40)

section entitled "Guilt-Innocence Phase Issues." Nowhere in those claims does he cite the Eighth Amendment to the United States Constitution. The only federal constitutional rights that he cites are those arising under the Sixth and Fourteenth Amendments – the rights to compulsory process, to confront his accusers and to present a defense. However, to the extent that the Sixth and Fourteenth Amendments apply to the sentencing phase, Petitioner did not claim that he was denied his right to compulsory process, the right to confront his accusers and the right to present a defense at sentencing when the trial court excluded the evidence at issue in this claim.

Petitioner argues that the phrase "the outcome of the trial could well have been different" was sufficient to fairly present a claim that his rights were violated at sentencing by the court's actions during the guilt/innocence phase of the trial. (July 25, 2005 Brief on Proc. Dflt.) Such an argument is unavailing. In North Carolina, a capital trial has two separate and distinct proceedings – a guilt/innocence phase and a sentencing phase. As Petitioner himself notes, an error during the guilt/innocence phase may not be serious enough to prejudice the verdict but it may be serious enough to prejudice the sentence. However, if Petitioner believed that was true in his case, he did not put forth an argument to that effect before the State courts.

As noted previously, "fair presentation" of a claim to a state court "mandates that the federal claim 'be presented face-up and squarely.... Oblique references which hint that a theory may be lurking in the woodwork will not suffice.'" *Baker v. Corcoran*, 220 F.3d at 289. Furthermore, a petitioner "must explain how these alleged events establish a violation of his constitutional rights." *Mallory v. Smith*, 27 F.3d at 994. In this case, Petitioner did not put forth any argument that the trial court's exclusion of the Henry Brown character evidence prejudiced the outcome of his sentencing proceeding. In fact, Petitioner did not mention "sentencing,"

101

"penalty phase" or "death penalty" anywhere in the three claims that he raised on direct appeal. Instead, his arguments focus solely on the reliability of the jury's verdict of first-degree murder. In short, Petitioner failed to "fairly present" either an Eighth Amendment claim or a claim that he was deprived of his Sixth and Fourteenth Amendment rights at sentencing when the trial court excluded the Henry Brown character evidence during the trial.

Therefore, this portion of Petitioner's claim was not exhausted in the State courts, and Petitioner would be barred from bringing it in State court if he attempted to do so now. *See* § 15A-1419(a). Furthermore, Petitioner has failed to show cause and prejudice or that a fundamental miscarriage of justice would occur to excuse the procedural default. *See Coleman v. Thompson*, 501 U.S. at 750. Therefore, Petitioner's Eighth Amendment claim is procedurally defaulted on habeas review, as is any claim that Petitioner was deprived of his Sixth and Fourteenth Amendment rights at sentencing.

## CLAIM X: PETITIONER DEPRIVED OF RIGHT TO ALL EXCULPATORY EVIDENCE IN POSSESSION OF THE STATE PRIOR TO TRIAL

Petitioner claims that he was deprived of his right to due process when the State refused to disclose the name of the person to whom he allegedly stated that the gun had gone off by accident. *See Brady v. Maryland*, *supra*, 373 US at 87. Petitioner also claims that the State's refusal to turn over the name deprived him of his Sixth Amendment rights to effective assistance of counsel, his right to confront witnesses against him, his right to compulsory process and his right to present a defense.

Petitioner raised this *Brady* claim on direct appeal as Issue VI of Defendant-Appellant's Brief to the North Carolina Supreme Court. (Pet. Exhibit A) Petitioner's assertion to the

contrary, the North Carolina Supreme Court rejected Petitioner's *Brady* claim on the merits. *State v. Strickland*, 488 S.E.2d at 201. For the reasons articulated in this Court's adjudication of Claim I A(3) of the instant Petition, Petitioner's claim that he was deprived of his right to due process pursuant to *Brady v. Maryland* is denied. (Pp. 22-27 of the instant Order)

Petitioner also claims that the State's failure to turn over the name of the person to whom he stated that the gun had gone off by accident deprived him of his rights to effective assistance of counsel, his right to confront witnesses against him, his right to compulsory process and his right to present a defense. However, unlike his presentation of the *Brady* claim, which encompassed six (6) pages of argument and legal analysis, he asserts violations of these other constitutional rights in purely conclusory terms. In fact, his entire presentation consists of the following:

> Petitioner was also deprived of his Sixth Amendment right to the effective assistance of counsel, *Geder v. United States*, 425 U.S. 80 (1976); *Murray v. New York*, 422 U.S. 853 (1975); *Brooks v. Tennessee*, 406 U.S. 605 (1972); his right to confront witnesses against him, *Davis v. Alaska*, 415 U.S. 308 (1974); his right to compulsory process, *Washington v. Texas*, 388 U.S. 14 (1967) and his Fourteenth Amend right to present a defense, *Crane v. Kentucky*, 476 U.S. 683 (1986); *Chambers v. Mississippi*, 410 U.S. 284 (1973), by depriving him of any access to information needed to establish his innocence of first degree murder.

(PWHC, pp. 174-75, ¶ 739) The fact that Petitioner cites a U.S. Supreme Court case for each asserted constitutional right does not make the above-cited paragraph adequate to state claims in this Court. Petitioner has made no attempt to set forth any argument or legal analysis with regard to these asserted constitutional rights. Petitioner has failed to draw any connection between the constitutional rights he seeks to invoke and the actions of the trial court. For example, he has failed to articulate how the State's refusal to turn over the name deprived him of his right to

confront witnesses against him.

If Petitioner is not inclined to put forward any arguments to support these allegations, the Court certainly is not required to do it for him. *See Small v. Endicott, supra*, 998 F.2d at 418 (The court is not required to construct a petitioner's arguments for him). Petitioner's list of alleged constitutional violations is dismissed for failure to adequately state claims.

The Court notes further that to the extent that the above-cited paragraph is adequate to state federal claims, they must fail because Petitioner cannot show that the State suppressed or deprived Petitioner of the identity of the person to whom he said that the gun had gone off by accident. Petitioner is presumed to know to whom he has spoken about the shooting. *See Fullwood v Lee*, 290 F.3d at 686; *Stockton v. Murray, supra*, 41 F.3d at 927.

Finally, it appears that Petitioner may be attempting to raise a claim that he was prejudiced at sentencing by the trial court's refusal to require the State to disclose the name of the person to whom Petitioner allegedly stated that the shotgun went off by accident. It is not entirely clear to the Court whether Petitioner is raising such a claim because he fails to put forth any argument regarding sentencing. However, he makes one reference to the Eighth Amendment in the opening paragraph of this claim. To the extent that Petitioner is attempting to raise a claim with respect to sentencing, it is dismissed for the reasons outlined above. Specifically, he fails to set forth how or why the State's actions violated his Eighth Amendment rights or prejudiced the outcome of his sentencing. In fact, he fails to specify the rights protected by the Eighth Amendment that the State allegedly violated. He, therefore, has failed to adequately state an Eighth Amendment claim in this Court.

**CLAIM XI: REFUSAL TO SIGN A WRITTEN STATEMENT**

After his arrest for the murder of Henry Brown, Petitioner made extensive oral statements to Agent Underwood and to Detective Tucker. Agent Underwood testified at trial regarding Petitioner's oral statement. He also testified, over Petitioner's objection, that when asked if he would make a written statement, Petitioner said he would not. (Tpp 1211) Petitioner claims that Agent Underwood's testimony that he would not make a written statement violated his Fifth and Fourteenth Amendment right to due process and his right against self-incrimination.

Petitioner raised this claim as Issue VII of Defendant-Appellant's Brief to the North Carolina Supreme Court. (Pet. Exhibit A) The court denied the claim on the merits. *See State v. Strickland*, 488 S.E.2d at 203.

It is well established that the State may not use a defendant's post-arrest, post-*Miranda* silence either to impeach the defendant's testimony at trial, *see Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), or as evidence of guilt during the State's case-in-chief, *see Wainwright v. Garfield*, 474 U.S. 284, 292, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). Reference to the accused's post-*Miranda* silence usually is impermissible because it is fundamentally unfair for the government to induce silence through *Miranda* warnings and then to later use that silence against the accused. *See Doyle*, 426 U.S. at 617-18, 96 S.Ct. at 2244-45. However, when the accused waives his right to remain silent and agrees to questioning, no such inducement has occurred. *See Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182 (1980) (per curiam) ("[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.").

Agent Underwood testified that he informed Petitioner of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) prior to interrogating him. (Tp

1166)  Petitioner voluntarily waived those rights and made a long and detailed oral statement to investigating officers during an interview that lasted approximately an hour. (Tpp 1164; 1206) Petitioner then was asked if he wanted to write out a statement going over the same information that he had just told the officers, and he responded, "No." (Tp 1211)  Although never specifically stated, it appears that the interview concluded at that point. (Tpp 1174; 1211)

In its rejection of this claim, the North Carolina Supreme Court appears to have accepted without question Petitioner's characterization of his refusal to put his oral admission of guilt into writing as an invocation of his right to silence.  This Court, however, views this characterization by Petitioner with skepticism.

Petitioner was given his *Miranda* warnings, which he orally waived.  Over the course of approximately one hour, he made a lengthy and detailed oral statement to police, during which he not only admitted shooting Henry Brown but gave his reasons for doing so.  Subsequently, Petitioner was asked if he wanted to put his oral statement in writing, and he responded, "No." After conducting a voir dire of Agent Underwood to determine the admissibility of Strickland's oral statement to police, the trial court found as a matter of fact that "at no time did [Strickland] expressly or impliedly indicate to the officers that he wished to stop discussing the [shooting] . . . ." (Tp 1199)  Petitioner has failed to show that this finding of fact was clearly erroneous. *See* § 2254(e)(1).  Agent Underwood testified that Petitioner never told investigators that he did not want to talk to them any more or tell them that he would not answer any more questions. (Tpp 1166-68; 1175; 1181;1184-85)

This Court finds that when he indicated that he did not want to write out a statement going over the same information that he had just told the officers, Petitioner was not invoking his

right to silence. Instead, Strickland merely was declining to repeat in writing what he had just said out loud. Or put another way, after having spent an hour orally incriminating himself, Petitioner declined to incriminate himself in writing. This does not imply that Strickland was no longer willing to talk to officers about the shooting. Therefore, Agent Underwood's trial testimony that Petitioner declined to convert his oral statement to a written one was a description of the conclusion of Petitioner's voluntary conversation with police and not a comment on Petitioner's "silence."

Even if testimony regarding Petitioner's decision not to put his oral admission of guilt into writing did constitute an impermissible comment upon his silence, Petitioner cannot show that it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, *supra*, 507 U.S. at 623, 113 S.Ct. at 1714. Agent Underwood's testimony that Petitioner declined to put his oral statement into writing did not come in response to a question by the prosecutor but was part of Agent Underwood's description of his and Detective Tucker's conversation with Petitioner. (Tpp. 1207-11) On cross-examination, *defense counsel* then invited attention to the fact that Petitioner had not made a written statement by questioning Agent Underwood about the notes he was referring to during his testimony. It was revealed that Agent Underwood was referring to the notes he made during his interview with Petitioner. Counsel asked a number of questions calling into question the accuracy of those notes. (Tpp 1213-16) On redirect examination, the prosecutor countered by asking questions designed to bolster the accuracy of Agent Underwood's notes of the interview. (Tpp 1217-18). One of the questions he asked was whether Agent Underwood had offered Strickland the opportunity to write out a statement himself. The trial court sustained defense counsel's objection. (Tp 1218) The

prosecutor did not repeat the reference, question other witnesses regarding Petitioner's decision not to reduce his oral statement to writing, or address the issue during closing argument. *See Greer v. Miller*, 483 U.S. 756, 764, 107 S.Ct. 3102, 3108, 97 L.Ed.2d 618 (1987) ("It is significant that in each of the cases in which this Court has applied *Doyle*, the trial court has permitted specific inquiry or argument respecting the defendant's post-*Miranda* silence."). In short, the prosecutor did not invite the jury to infer that Petitioner was guilty because he declined to put his oral admission of guilt into writing.

Furthermore, the jury heard ample evidence of guilt, including Petitioner's entire oral confession to police that he had shot Henry Brown because Brown had called him a "punk-ass Indian son-of-bitch." Thus, any error in the officer's testimony cannot be said to have "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 113 S.Ct. at 1714. For the foregoing reasons, the North Carolina Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d)(1).

## CLAIM XII: PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS[62]

Petitioner claims that prosecutors argued false and misleading facts and misstated the law during closing arguments at the guilt/innocence phase of the trial, thereby violating his due process and fair trial rights under the Fourteenth Amendment. However, trial counsel failed to timely object to any of the comments that Petitioner now alleges were errors in the prosecutors' closing arguments. When he sought to raise this issue on direct review, the Supreme Court of North Carolina concluded that Petitioner had failed to properly preserve the issue for appeal

---

[62]The Court ordered the parties to address this claim in its June 14, 2005 Order.

because he did not object to the comments at trial. *See State v. Strickland*, 488 S.E.2d at 203. It therefore reviewed the record only to assess whether the prosecutor's comments "amounted to gross impropriety." *Id*. (internal quotations and citations omitted).[63] Under this standard, "[o]nly an extreme impropriety on the part of the prosecutor will compel [the Appellate] Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 467 S.E.2d 685, 693, (NC 1996), *cert. denied*, 519 U.S. 890, 117 S.Ct. 229 (1996). The North Carolina Supreme Court concluded that "the prosecutors' arguments did not rise to the level of such gross impropriety as to require intervention by the trial court on its own motion." *See State v. Strickland*, 488 S.E.2d at 204.

Because Petitioner failed to preserve a constitutional challenge to the prosecutors' closing arguments for his direct appeal, this Court is procedurally barred under the North Carolina contemporaneous objection rule from considering this claim. *See Daniels v. Lee*, 316 F.3d 477, 486-488 (4th Cir. 2003); *Howard v. Moore*, 131 F.3d 399, 420 (4th Cir. 1997) ("Errors at trial not objected to, in contravention of State contemporaneous objection rules, are not cognizable in federal habeas corpus proceedings . . . .") (quoting *Satterfield v. Zahradnick*, 572 F.2d 443, 446 (4th Cir.1978)); *Davis v. Allsbrooks*, 778 F.2d 168, 174 (4th Cir.1985). This is the case even though the North Carolina Supreme Court addressed Petitioner's claim of error on direct appeal under "the gross impropriety standard." *See Daniels*, 316 F.3d at 487 (citing *Davis v. Allsbrooks*,

---

[63] When a defendant fails to timely object at trial to a prosecutor's closing argument but attempts to challenge the argument on appeal, the Supreme Court of North Carolina reviews the record for "gross impropriety." *See State v. Thomas*, 350 N.C. 315, 360-61, 514 S.E.2d 486, 514, cert. denied, 528 U.S. 1006, 120 S.Ct. 503, 145 L.Ed.2d 388 (1999).

778 F.2d at 176). In *Davis*, the Fourth Circuit held that the rule barring habeas review of a claim rejected by a state court on a procedural ground applies when a state court conducts a plain error review after having found a procedural default. *See Daniels*, 316 F.3d at 487 (citing *Davis v. Allsbrooks*, 778 F.2d at 176; *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("We have held that [a] contemporaneous objection rule ... bars federal habeas review absent a showing of cause and prejudice.... Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default.")). Thus, when the North Carolina Supreme Court reviewed the prosecutors' remarks for "gross impropriety," it was applying a North Carolina procedural rule. *See id*.

Petitioner has failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice would occur to excuse his failure to preserve this issue by a timely objection. Indeed, Petitioner has alleged neither cause nor prejudice with respect to his failure to timely object to the prosecution's closing argument. This claim is procedurally defaulted. *See Wainwright v. Sykes*, 433 U.S. 72, 82, 97 S.Ct. 2497 (1977); *Fisher v. Angelone*, 163 F.3d at 844.

## CLAIM XIII: DENIED RIGHT TO PRESENT EVIDENCE IN SUPPORT OF A SENTENCE LESS THAN DEATH

In the penalty phase of the trial, the State relied on one aggravating factor in support of the death penalty – that the defendant has been previously convicted of a crime involving the use or threat of violence. *See* § 15A-2000(e)(3). The State presented evidence that Petitioner had been convicted in Richmond County of voluntary manslaughter and in Anson County of assault with a deadly weapon inflicting serious injury. Petitioner alleges that he was denied the right during sentencing to show that his act of shooting the victim in the voluntary manslaughter case

was an act in response to the victim having a weapon.  He claims this prevented him from introducing evidence that justified a sentence less than death.

In the instant Petition, Strickland asserts that the trial court prohibited him from eliciting testimony from Officer James Clemmons that his investigation indicated that the victim, Derrick Skipper, was the aggressor and that he was found with a weapon that had been discharged four times. (PWHC, p. 185, ¶¶ 773-74)  Petitioner argues further that he was prevented from introducing evidence and arguing to the jury that one of his prior crimes was committed in self-defense or at least in response to aggression by the victim. (PWHC, p. 188, ¶¶ 780 & 782-83)

With one exception, these allegations are conclusory, and Strickland fails to identify for this Court the evidence of self-defense or of Skipper's aggression that the trial court allegedly excluded.  The one piece of evidence that Petitioner does identify – that Skipper was found with a weapon that had been discharged four times – *was* admitted through the testimony of Officer Clemmons. (Tp 1484)  Because Petitioner has failed to allege any facts to support this claim, it is dismissed.

## CLAIM XIV: PETITIONER DEPRIVED OF RIGHT TO HAVE JURY CONSIDER EVIDENCE IN SUPPORT OF A SENTENCE LESS THAN DEATH

Petitioner claims that the trial court's failure to submit the statutory mitigating factors that the murder was committed while defendant was under the influence of mental or emotional disturbance, § 15A-20000(f)(2), and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, § 15A-20000(f)(6), to the jury at sentencing deprived him of his right to present evidence in support of

mitigation under the Eighth and Fourteenth Amendments.[64]  Petitioner claims that he similarly

was deprived of his right to present mitigating evidence when the trial court refused to submit

that "defendant feels he owes it to his children and his people to refuse any kind of mitigating

defense and instead to be a good strong Indian" to the jury as a non-statutory mitigating factor.

Petitioner presented these claims to the North Carolina Supreme Court in his direct

appeal as Issues XIV, XV and XVI of Defendant-Appellant's Brief. (Pet. Exhibit A)  The North

Carolina Supreme Court decided these issues on the merits.  The court held that the evidence

presented was insufficient to warrant submission of the two statutory mitigating factors and that

the trial court's failure to submit the non-statutory mitigating factor was harmless beyond a

reasonable doubt.  *See State v. Strickland*, 488 S.E.2d at 206-208.

This is the third time in the instant Petition that Petitioner has raised a claim that he was

entitled to submission of the (f)(2) and (f)(6) statutory mitigating factors. (see PWHC, Claim

IVA)  As the Court noted in its adjudication of Petitioner's previous claims raising this issue, the

United States Supreme Court has held that a sentencer "may not be precluded from considering,

and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan*,

*supra*, 522 U.S. at 276, 118 S.Ct. at 761 (citations omitted).  However, "the state may shape and

structure the jury's consideration of mitigation so long as it does not preclude the jury from

giving effect to any relevant mitigating evidence." *Id*. (citations omitted).  In other words, "a state

is only prohibited from 'placing relevant mitigating evidence beyond the effective reach of the

sentencer.' " *Williams v. French*, 146 F.3d 203, 216 n 15 (4th Cir. 1998) (quoting *Johnson v.*

---

[64]Because Petitioner did not request submission of these two statutory mitigating
circumstances, the Court assumes that Petitioner's complaint is based upon the trial court's
failure to submit these mitigating circumstances on its own motion.

*Texas*, 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (citations omitted)). So long as a state does not eliminate the presentation of relevant mitigating evidence or preclude the jury from considering certain types of mitigating evidence, it is free to guide the jury in its consideration of relevant mitigating evidence. *See id*. (citations omitted).

To the extent that statutory mitigating circumstances are used "to shape and structure the jury's consideration of mitigation" in a state capital sentencing scheme, they are creatures of state law. *See Buchanan*, 522 U.S. at 275-76 (no constitutional requirement that trial court issue instructions on particular mitigating factors); *see also Hill v. Mitchell*, 400 F.3d 308, 333 (6ᵗʰ Cir. 2005) ("The right to have certain statutory mitigating factors considered (or aggravating ones ignored) is a creature of state statute, not the federal Constitution.") (citations omitted). A state court's decision on a question of state law is binding in federal court. *See Roach v. Angelone*, *supra*,176 F.3d at 217; *Wright v. Angelone*, *supra*, 151 F.3d at 158. Thus, the North Carolina Supreme Court's determination that Strickland was not entitled to submission of either the § 15A-2000(f)(2) or (f)(6) mitigating circumstances is controlling, and this claim is not cognizable on federal habeas review. *See Estelle v. McGuire*, *supra*, 502 U.S. at 68, 112 S.Ct. at 116 (A federal habeas court's review is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Petitioner's claim that he was entitled to submission of the non-statutory mitigating factor that "defendant feels he owes it to his children and his people to refuse any kind of mitigating defense and instead to be a good strong Indian," also must fail. The North Carolina Supreme Court determined that even if the trial court should have submitted this non-statutory mitigating factor to the jury, its failure to do so was harmless beyond a reasonable doubt because it was

113

subsumed by another submitted non-statutory mitigating circumstance. Furthermore, the jurors were instructed to consider any other circumstance arising from the evidence that any of them deemed to have mitigating value under the catchall statutory mitigating circumstance, § 15A-2000(f)(9).

As the North Carolina Supreme Court noted, Petitioner presented evidence through the testimony of Dr. Worthen that Strickland had told him that he did not want anyone to beg for his life; that he would rather be executed than spend his life in prison; that he wanted his children to be proud of him; and that he wanted to be a good, strong Indian for his family. Nothing in the trial court's actions or instructions precluded the jury from considering this evidence during their deliberations. *See* § 15A-2000(f)(9). Therefore, the court's adjudication of this claim was neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d)(1).

## CLAIM XV: STATE INTRODUCED EVIDENCE OF AN INDICTMENT IN SUPPORT OF AN AGGRAVATING FACTOR

To prove the existence of the aggravating factor that the defendant had been previously convicted of a crime involving the use or threat of violence, *see* § 15A-2000(e)(3), the prosecutor read into evidence at sentencing the Bill of Indictment, the verdict and the judgment from Petitioner's Richmond County conviction and the Bill of Indictment, plea transcript and judgment from his Anson County conviction. In the Richmond County case, Petitioner was indicted for murder but was found guilty after a jury trial of voluntary manslaughter. In the Anson County case, Petitioner was indicted for assault with a deadly weapon with intent to kill, inflicting serious injury but pled guilty to assault with a deadly weapon inflicting serious injury. Petitioner argues that the reading of the indictments to the jury deprived him of his Sixth, Eighth

and Fourteenth Amendment rights.

Petitioner raised this claim as a preservation issue in his direct appeal. (Pet. Exh. A, Issue No. XXXVII)  The North Carolina Supreme Court denied the claim in summary fashion based upon its prior holdings.  *See State v. Strickland*, 488 S.E.2d at 208-209.

The gist of Petitioner's claim is that the indictments were nothing more than allegations based upon unreliable hearsay evidence.  Introduction of these indictments, he argues, deprived him of his right to confront the witnesses against him because he was unable to cross-examine either the grand jurors that returned the indictments or the witnesses upon whose testimony the grand jurors relied in returning the indictments.  Petitioner argues further that to permit the jury to consider unreliable evidence that was not subject to confrontation to support the sole aggravating factor violated his Sixth, Eighth and Fourteenth Amendment rights to confront witnesses against him and to a reliable sentencing determination, freedom from cruel and unusual punishment and due process of law.

Section 2254(d)(1) makes it clear that a federal court may not grant habeas relief on the basis of claims rejected on the merits by the state courts unless the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*." (emphasis added)  Thus, "an absolute prerequisite for petitioner's claim is that the asserted constitutional right on which it rests derive in clear fashion from Supreme Court precedent" as of the time of the relevant state court decision. *Carter v. Ward*, 347 F.3d 860, 863 (10th Cir. 2003).

The Supreme Court has never decided whether sentencings are "criminal prosecutions" for Sixth Amendment purposes.  *See United States v. Johnson*, 935 F.2d 47, 50 (4th Cir. 1991).

As such, there is no clearly established Federal law, as determined by the Supreme Court of the United States, that the Confrontation Clause applies in a capital sentencing proceeding. *See U.S. v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) ("It is far from clear that the Confrontation Clause applies to a capital sentencing proceeding."); *Maynard v. Dixon*, 943 F.2d 407, 414 n. 5 (4th Cir.1991) (noting that the question of whether the Confrontation Clause applies in sentencing proceedings remains undecided).

Even if it can be presumed that a defendant has some right to confront witnesses against him at a sentencing proceeding (e.g. the right to cross-examine witnesses who testify for the state at sentencing), the extent to which hearsay evidence may be excluded at sentencing under the Confrontation Clause is not clearly established. *See e.g. Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004) (holding that admission at a criminal *trial* of the testimonial statement of a person who does not appear as a witness at the trial may not be admitted against the accused to prove the truth of the statement unless the declarant is unavailable to appear as a witness and the accused had a prior opportunity for cross-examination, but implying that admission of *nontestimonial* hearsay evidence may be governed by State hearsay law and/or exempted from Confrontation Clause scrutiny altogether) (emphasis added).  Because the Supreme Court has yet to decide whether introduction of hearsay evidence at a sentencing proceeding violates a defendant's rights under the Sixth Amendment's Confrontation Clause, the State court's rejection of this claim was neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d)(1); *Williams v. Taylor*, *supra*, 529 U.S. at 405-08 (setting out the standards for determining whether a state court's adjudication was "contrary to" or an "unreasonable application of" the law as set forth by the United States Supreme Court).

Finally, assuming *arguendo* that it was error to allow the prosecutor to read the indictments to the jury, Petitioner cannot show that it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, *supra*, 507 U.S. at 623, 113 S.Ct. at 1714. The indictments were read once at the very beginning of the prosecutor's opening statement at the sentencing phase of the trial. In contrast, throughout the remainder of the sentencing proceeding, the jury was told multiple times by the prosecutor, defense counsel and the judge that Strickland had been *convicted* of voluntary manslaughter and assault with a deadly weapon inflicting serious injury. In fact, the jury was told ten (10) times that Strickland had been convicted of voluntary manslaughter and eight (8) times that he had been convicted of assault with a deadly weapon inflicting serious injury. (Tpp 1508-09, 1517, 1529, 1540-41) Defense counsel even argued that since the State agreed to a probationary sentence for the assault conviction, it must not have considered the crime to be very serious. Even assuming that by the end of the sentencing proceeding jurors could remember what Strickland originally had been charged with, there would have been no confusion in their minds about the crimes of which he actually was convicted. Thus, Strickland cannot show that he suffered "actual prejudice" from the reading of the indictments to the jury. *Brecht*, 507 U.S. at 637 (holding that an error does not have a substantial and injurious effect on a jury verdict unless "it resulted in 'actual prejudice'" to the habeas petitioner).

**CLAIM XVI: SENTENCE OF DEATH UNSUPPORTED BY VALID FINDING OF AN AGGRAVATING FACTOR**

This claim was dismissed by a previous written Order filed April 26, 2002.

The Court cannot let this case pass without commenting on the behavior of the prosecution at Petitioner's trial. It is common practice for law enforcement to interview witnesses to shootings. Obviously aware of this fact, trial counsel made a request in open court and pursuant to North Carolina law that prosecutors provide the defense with any prior statement that Gail Brown had made that was in the possession of the prosecution. (Tp. 1310) Despite the fact that Gail had been interviewed twice by Agent Tony Underwood, the prosecution denied that she had made any statement. (Tp. 1310)

Under North Carolina's discovery laws in place at the time of Petitioner's trial, after a witness called by the State had testified on direct examination and upon a motion of the defendant, the State was required to produce any statement of the witness in its possession that related to the subject matter of the witness's testimony. *See* N.C. Gen. Stat. § 15A-903(f)(2) (1995). If the prosecution refused to produce the statement(s), it was subject to possible sanctions. *See* § 15A-903(f)(4). The prosecution in this case got around the discovery requirements by simply telling the trial judge, in open court and on the record, that Gail Brown had not made any statements. (Tp. 1310)

Alone, the falsehood to the trial court is disturbing.[65] What is equally bothersome to this Court, however, is the damage this type of behavior does to the judicial process. Enshrined in our Bill of Rights is the idea that in a criminal prosecution, the accused has the right to a fair process. *See e.g.* U.S. Const. amends. IV, V, VI & XIV, §1. Likewise, most American prosecutors believe that in light of the enormous discretion given them, their role in the judicial

---

[65]In post-conviction, the MAR court held that Gail's statements to Agent Underwood should have been disclosed to the defense under state law.

system is not solely to convict but to see that justice is done. When prosecutors believe that they need to hide evidence in order to obtain a desired verdict or a desired sentence, it raises questions about whether justice is, in fact, being done.

Gail Brown lied to Agent Underwood when she told him that noone used drugs on the night of the shooting. Her testimony about her husband's behavior on the night of the shooting was so different from Sherry Strickland's that they could have been at different places that night. Had trial counsel had Gail's statements to Agent Underwood, they could have questioned her more effectively about what went on the night her husband was killed. Had they been able to impeach Gail with the inconsistencies in her testimony and her statements, trial counsel might have been able to call into question the veracity of the State's main witness. It is, after all, important in the pursuit of fair a process that witnesses testify truthfully.

The irony is that the prosecution did not need to hide Gail's statements to obtain a first-degree murder conviction and death sentence. Petitioner's loquaciousness took care of that. He bragged to police after the murder, giving prosecutors everything they needed to prove premeditation and deliberation (e.g., Petitioner's admissions that he meant to kill Brown, that he stood close to him so he wouldn't miss, and that he had to cock the gun to get it to shoot (Tp. 1210)). And, he refused to cooperate with his trial attorneys in mitigation. That insured that at sentencing, the jury heard only that in addition to deliberately shooting Henry Brown, Petitioner already had killed one man and had stabbed and attempted to run over another.

Petitioner's failure to prevail on his *Brady* and *Giglio* claims was not because prosecutors did nothing wrong. In suppressing Gail's statements to Agent Underwood and lying about it to the court, the prosecution lost sight of what the American judicial system strives to guarantee –

justice at the end of fair trial.

IT IS HEREBY ORDERED THAT:

Petitioner's Motion to Hold this Matter in Abeyance pending the United States Supreme Court's decision in *Rompilla v. Horn,* No. 04-5462, *decided sub. nom. Rompilla v. Beard*, ___ U.S. ___, 125 S.Ct. 2456 (2005) is DISMISSED as moot [Doc. 64];

Petitioner's Petition for Writ of Habeas Corpus is DENIED [Doc. 1];

Respondent's Motion to file Supplemental Authority is GRANTED [Doc. 66];

and

Respondent's Motion for Summary Judgment is GRANTED [Doc. 21].

Signed: January 29, 2007

Graham C. Mullen
United States District Judge